UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

SCHEDULE 14A
(Rule 14(a)-101)

INFORMATION REQUIRED IN PROXY STATEMENT

SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934

Filed by the registrant [X]
Filed by a party other than the registrant [ ]

Check the appropriate box:

[ ] Preliminary proxy statement.
[ ] Confidential, for use of the
    Commission only (as permitted by
    Rule 14a-6(e)(2)).
[X] Definitive proxy statement.
[ ] Definitive additional materials.
[ ] Soliciting material pursuant to Section 240.14a-12

UNICO, INCORPORATED

(Name of Registrant as Specified in Its Charter)

(Name of Person(s) Filing Proxy Statement if Other Than the Registrant)

Payment of filing fee (check the appropriate box):
[X] No fee required.
[ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

[ ] Fee paid previously with preliminary materials.

[ ] Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

(1) Amount Previously Paid:

_____

(2) Form, Schedule or Registration Statement No.:

_____

(3) Filing Party:

_____

(4) Date Filed:

_____

UNICO, INCORPORATED
8880 Rio San Diego Drive, 8th Floor
San Diego, California  92108
(619) 209-6124

NOTICE OF SPECIAL MEETING OF SHAREHOLDERS
TO BE HELD ON DECEMBER 21, 2007

Dear Shareholders:

A special meeting of shareholders of Unico, Incorporated, an Arizona corporation (the "Company"), will be held on December 21, 2007 at 10:00 a.m. local time, at the Hilton San Diego Mission Valley, 901 Camino del Rio South, San Diego, California, 92108 for the following purpose:

|  | RECOMMENDED VOTE |
|---|---|
| To consider and vote upon a proposal to amend the Company's Articles of Incorporation to authorize the Board of Directors, in its discretion, to effect a reverse stock split of the Company's Common Stock at a ratio of up to one-for-five hundred during the six month period following the date of the Special Meeting of Shareholders. | FOR |

Only shareholders of record shown on the books of Unico at the close of business on November 19, 2007 will be entitled to vote at the meeting or any adjournment thereof. Each shareholder is entitled to one vote per share on all matters to be voted on at the meeting.

You are cordially invited to attend the meeting. Whether or not you plan to attend the meeting, please sign, date and return your proxy in the return envelope provided as soon as possible. Please mail your completed and signed proxy before December 15, 2007 so that we will receive it prior to the special meeting of shareholders. Your cooperation in promptly signing and returning your proxy will help avoid further solicitation expense to Unico.

This notice, the proxy statement and the enclosed proxy are sent to you by order of the board of directors.

/s/ Mark A. Lopez
Mark A. Lopez
*Chief Executive Officer*

San Diego, CA
November 27, 2007

3

UNICO, INCORPORATED,
an Arizona corporation

PROXY STATEMENT
FOR
SPECIAL MEETING OF SHAREHOLDERS
TO BE HELD DECEMBER 21, 2007

_____

## INTRODUCTION

Your proxy is solicited by the board of directors of Unico, Incorporated, an Arizona corporation ("Unico" or the "Company") for use at a special meeting of shareholders to be held on December 21, 2007, and at any adjournment thereof, for the purposes set forth in the attached notice of special meeting.

The cost of soliciting proxies, including preparing, assembling and mailing the proxies and soliciting material, will be borne by Unico. Directors, officers, and regular employees of Unico may, without compensation other than their regular compensation, solicit proxies personally, by telephone or electronic communication including facsimile and electronic mail.

Any shareholder giving a proxy may revoke it at any time prior to its use at the meeting by giving written notice of such revocation to the Secretary or other officer of Unico or by filing a new written proxy with an officer of Unico. Personal attendance at the meeting is not, by itself, sufficient to revoke a proxy unless written notice of the revocation or a subsequent proxy is delivered to an officer before the revoked or superseded proxy is used at the meeting.

Proxies not revoked will be voted in accordance with the choice specified by means of the ballot provided on the proxy for that purpose. Proxies which are signed but which lack any such specification will, subject to the following, be voted in favor of the proposals set forth in the notice of special meeting. If a shareholder abstains from voting as to any matter, then the shares held by such shareholder shall be deemed present at the meeting for purposes of determining a quorum and for purposes of calculating the vote with respect to such matter, but shall not be deemed to have been voted in favor of such matter. Abstentions, therefore, as to any proposal will have the same effect as votes against such proposal. If a broker returns a "non-vote" proxy, indicating a lack of voting instruction by the beneficial holder of the shares and lack of discretionary authority on the part of the broker to vote on a particular matter, then the shares covered by such non-vote shall be deemed present at the meeting for purposes of determining a quorum but shall not be deemed to be represented at the meeting for purposes of calculating the vote required for approval of such matter.

The mailing address of Unico's principal executive office is 8880 Rio San Diego Drive, 8th Floor, San Diego, California 92108. This proxy statement and the related proxy and notice of the special meeting will first be mailed to the shareholders on or about November 27, 2007.

4

VOTING RIGHTS AND REQUIREMENTS

VOTING SECURITIES

Unico's Board of Directors has fixed November 19, 2007 as the "Record Date" for determining shareholders entitled to vote at the special meeting. Persons who were not shareholders of record at the close of business on such date will not be allowed to vote at the special meeting.  At the close of business on the Record Date, there were approximately 4,815,363,072 shares of Unico's Common Stock and 9,800,000 shares of Unico's Series A Preferred Stock issued and outstanding.  Common Stock has 1 vote per share and Series A Preferred Stock has no voting rights, except for the election of two directors.

Votes cast by proxy or in person at the special meeting will be tabulated by Mark Lopez who has been appointed as the inspector of election prior to the special meeting.  He will also determine whether a quorum is present.  In the event of any abstentions or broker non-votes with respect to any proposal coming before the special meeting, a proxy will be counted as present for purposes of determining the existence of a quorum.  Abstentions and broker non-votes typically will not be counted for purposes of approving any of the matters to be acted upon at the special meeting.  A broker non-vote generally occurs when a broker or nominee who holds shares in street name for a customer does not have authority to vote on certain non-routine matters because its customer has not provided any voting instructions on the matter. Therefore, abstentions and broker non-votes generally have no effect under Arizona law with respect to the election of directors or other matters requiring the approval of only a majority of the shares of common stock present and voting at the meeting.

REVOCABILITY OF PROXY

You may revoke your proxy at any time prior to the start of our special meeting in three ways:

1.  by delivering a written notice of revocation to Mr. Mark Lopez, the Chief Executive Officer of Unico, at 8880 Rio San Diego Drive, 8th Floor, San Diego, California  92108;

2.  by submitting a duly executed proxy bearing a later date; or

3.  by attending our special meeting and expressing the desire to vote your common shares in person (attendance at our special meeting will not in and of itself revoke a proxy).

DISSENTERS - RIGHTS OF APPRAISALS

Under Arizona law, shareholders of our common stock are not entitled to dissenter's rights of appraisal with respect to our proposal.

QUORUM

The presence (in person or by proxy) at the special meeting of the holders of a number of shares of our Common Stock representing more than 2,407,681,537 votes (in excess of one-half of the number of votes eligible to be voted at the special meeting) will constitute a quorum for transacting business.

VOTE REQUIRED

We are required to obtain the affirmative vote of at least a majority of the voting shares that are present or represented at the special meeting in order to effect the shareholder approval described herein.

BOARD RECOMMENDATIONS - INSIDERS' INTENT TO VOTE IN FAVOR

Our Board of Directors has determined that each of the proposals is in the best interests of the Company and our shareholders.  Accordingly, the Board of Directors has unanimously approved each proposal and recommends that the shareholders vote in favor of each proposal as well.

Members of our board of directors collectively own 19,228,629 shares of Unico's common stock, or approximately 0.4% of the votes entitled to be cast at the special meeting.  They have indicated their intentions to vote their shares in favor of each proposal.

MATTER TO BE ACTED UPON

INFORMATION REGARDING THE PROPOSAL

AMENDMENT OF ARTICLES OF INCORPORATION TO EFFECT A REVERSE STOCK SPLIT

The proposal to amend the Company's Articles of Incorporation is described below. A copy of the proposed amendment to the Company's Articles of Incorporation is attached to this proxy statement as Exhibit A.

Purpose: The Board of Directors may effect a reverse stock split anytime during the six months following the date of the Special Meeting of Shareholders based upon any ratio up to a maximum ratio of one-for-five hundred, with the exact ratio to be established within this range by the Board of Directors in its sole discretion at the time it elects to effect the split. The Board of Directors believes that the Reverse Split is in the Company's best interests in that it may increase the trading price of the Common Stock. An increase in the price of the Common Stock should, in turn, generate greater investor interest in the Common Stock, thereby enhancing the marketability of the Common Stock to the financial community. In addition, the resulting reduction in the number of issued and outstanding shares of Common Stock, while keeping the number of authorized shares of Common Stock at 5,000,000,000 shares, will provide the Company with additional authorized but unissued shares which could be utilized for future fundraising, acquisitions or mergers or to otherwise carry out the Company's business objectives.

Effect: Although the Reverse Split may increase the market price of the Common Stock, the actual effect of the Reverse Split on the market price cannot be predicted. The market price of the Common Stock may not rise in proportion to the reduction in the number of shares outstanding as a result of the Reverse Split. Further, there is no assurance that the Reverse Split will lead to a sustained increase in the market price of the Common Stock. The market price of the Common Stock may also change as a result of other

unrelated factors, including the Company's operating performance and other
factors related to its business as well as general market conditions. The
Reverse Split will affect all of the holders of the Company's Common Stock
uniformly and will not affect any shareholder's percentage ownership interest
in the Company or proportionate voting power, except for insignificant
changes that will result from the rounding of fractional shares either up or
down (see discussion below).  However, because the conversion ratio of the
Company's convertible preferred stock will not be affected by the reverse
stock split, the current Common Stock holders will be diluted at different
levels depending on the actual ratio of the reverse split.  A greater ratio
of the reverse split will result in greater actual dilution to current Common
Stock shareholders.  The following table reflects the effect of various
ratios of reverse stock splits on the current shareholders.  Information with
respect to shares issuable upon conversion of convertible debentures is based
upon the closing price of the Common Stock as of November 8, 2007.

| Reverse Ratio | Resulting Shares Issued & Outstanding | Reserved for Issuance | Authorized but Unreserved(1) |
|---|---|---|---|
| 1-for-25 | 192,614,523 | 2,103,428 | 4,805,282,049 |
| 1-for-50 | 96,307,261 | 1,051,714 | 4,902,641,025 |
| 1-for-75 | 64,204,841 | 701,143 | 4,935,094,016 |
| 1-for 100 | 48,153,631 | 525,857 | 4,951,320,512 |
| 1-for 200 | 24,076,815 | 262,929 | 4,975,660,256 |
| 1-for 500 | 9,630,726 | 105,171 | 4,990,264,102 |
| Current | 4,815,363,072 | 52,585,700 | 132,051,228 |

The reverse stock split will provide the Company with available shares which
could be issued for various corporate purposes, including acquisitions, stock
dividends, stock splits, stock options, convertible debt and equity
financings, as the Board of Directors determines in its discretion. The Board
further believes that the increase in the number of authorized shares of
Common Stock will enable the Company to promptly take advantage of market
conditions and the availability of favorable opportunities without the delay
and expense associated with holding a special meeting of shareholders. The
Company presently has no specific plans, arrangements or understandings,
either written or oral, to issue any of the additional authorized shares of
Common Stock, except that:  (a) the Company presently has outstanding certain
convertible debentures and 9,800,000 shares of Series A Preferred Stock, all
of which are convertible to shares of the Company's Common Stock, and some or
all of which may be converted to shares of the Company's Common Stock in the
future; (b) the Company previously entered into stock payable agreements
pursuant to which the Company received $999,000 and for which it is obligated

7

to issue an aggregate of 42,785,700 shares of Common Stock, and (c) the Company intends to raise significant funds in the future to be used to support the operations of the Company and its subsidiaries and possibly to exercise the option to acquire ownership of the Bromide Basin Mine, and the Company will likely issue a substantial number of the Company's shares of Common Stock for these purposes. Although the Company cannot at the present time estimate the number of shares of Common Stock which it may issue in the future, the Company will require $835,000 in order to acquire ownership of the Bromide Basin Mine. If the Company sold shares of Common Stock at the current market price of $0.0011 per share, an aggregate of 759,090,909 shares of Common Stock would need to be sold to raise $835,000. The Company has no present plans or arrangement to make any such sales of Common Stock and any such sales could be on terms substantially different than a market price offering, which could result in substantially greater dilution to current shareholders. With regard to other funds required to support the operations of the Company, the Company has no present plans, arrangements or agreements.

The increase in the number of shares of common stock authorized for issuance as a result of the reverse split could, under certain circumstances, be construed as having an anti-takeover effect. For example, in the event a person seeks to effect a change in the composition of our board of directors or contemplates a tender offer or other transaction involving the combination of the Company with another company, it may be possible for us to impede the attempt by issuing additional shares of common stock, thereby diluting the voting power of the other outstanding shares and increasing the potential cost to acquire control of the Company. By potentially discouraging initiation of any such unsolicited takeover attempt, the increased number of authorized shares of Common Stock may limit the opportunity for our stockholders to dispose of their shares at the higher price generally available in takeover attempts or that may be available under a merger proposal. The amendment may also have the effect of permitting our current management, including our board of directors, to retain its position indefinitely and place it in a better position to resist changes that stockholders may wish to make if they are dissatisfied with the conduct of our business.

Procedure for Effecting Reverse Split: The Reverse Split of the Company's Common Stock will become effective at the discretion of the Board of Directors on any date designated by the Board of Directors (the "Effective Date") within six months following the date of the Special Meeting of Shareholders. The Reverse Split will take place on the Effective Date without any additional action on the part of the holders of the Common Stock and without regard to current certificates representing shares of Common Stock being physically surrendered for certificates representing the number of shares of Common Stock each shareholder is entitled to receive as a result of the Reverse Split. New certificates of Common Stock will not be issued.

Fractional Shares: No fractional shares will be issued in connection with the Reverse Split. Shareholders who would otherwise be entitled to receive fractional shares because they hold a number of shares of Common Stock that is not evenly divisible by the ratio selected by the Board of Directors will receive an additional fractional share such that they receive an even number of shares. For example, a shareholder who would be entitled to receive one-

fourth of a share would instead receive one full additional share of Unico's common stock on the date that the Reverse Split is implemented.

Federal Income Tax Consequences of Reverse Split: The following summary of certain material federal income tax consequences of the Reverse Split does not purport to be a complete discussion of all of the possible federal income tax consequences and is included for general information only. Further, it does not address any state, local, foreign or other income tax consequences, nor does it address the tax consequences to shareholders that are subject to special tax rules, such as banks, insurance companies, regulated investment companies, personal holding companies, foreign entities, nonresident alien individuals, broker-dealers and tax-exempt entities. The discussion is based on the United States federal income tax laws as of the date of this Information Statement. Such laws are subject to change retroactively as well as prospectively. This summary also assumes that the shares of the Company's Common Stock are held as "capital assets," as defined in the Internal Revenue Code of 1986, as amended (i.e., generally, property held for investment). The tax treatment of a shareholder may vary depending on the facts and circumstances of such shareholder. EACH SHAREHOLDER IS URGED TO CONSULT WITH SUCH SHAREHOLDER'S TAX ADVISOR WITH RESPECT TO THE PARTICULAR TAX CONSEQUENCES OF THE REVERSE SPLIT.

No gain or loss should be recognized by a shareholder upon the shareholder's exchange of shares pursuant to the Reverse Split. The aggregate tax basis of the shares received in the Reverse Split will be the same as the shareholder's aggregate tax basis in the shares exchanged. The shareholder's holding period for the shares received in the Reverse Split will include the period during which the shareholder held the shares surrendered as a result of the Reverse Split. The Company's views regarding the tax consequences of the Reverse Split are not binding upon the Internal Revenue Service or the courts, and there is no assurance that the Internal Revenue Service or the courts would accept the positions expressed above. The state and local tax consequences of the Reverse Split may vary significantly as to each shareholder, depending on the state in which such shareholder resides.

No Dissenters' Rights: The holders of the Company's Common Stock are not entitled to dissenters' rights in connection with the Reverse Split. Furthermore, the Company does not intend to independently provide those shareholders with any such rights.

RECOMMENDATION OF THE BOARD OF DIRECTORS:  THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" THE AMENDMENT TO UNICO'S ARTICLES OF INCORPORATION TO AUTHORIZE THE BOARD OF DIRECTORS, IN ITS DISCRETION, TO EFFECT THE REVERSE SPLIT.

## INTERESTS OF CERTAIN PERSONS IN THE PROPOSALS

No director, executive officer, associate of any director or executive officer or any other person has any substantial interest, direct or indirect, by security holdings or otherwise, in the proposal to amend the Articles of Incorporation to authorize the Board of Directors, in its discretion, to effect a reverse split of the Company's Common Stock which is not shared by all other holders of the Company's Common Stock with the exception that directors (who also serve as employees) and executive officers who hold

shares of the Company's Series A Preferred Stock may benefit from a reverse split of the shares of the Company's Common Stock since each share of Series A Preferred Stock is convertible into shares of the Company's Common Stock on a one-for-one (1:1) basis, and the conversion ratio is not affected by forward or reverse stock splits of shares of the Common Stock. See "Security Ownership of Certain Beneficial Owners and Management." Mark A. Lopez, C. Wayne Hartle and Ray Brown are each holders of shares of Series A Preferred Stock of the Company. As such, they may benefit from a reverse split of the shares of Common Stock.

DESCRIPTION OF CAPITAL STOCK

The authorized capital stock of the Company consists of the following:

COMMON STOCK

As of the Record Date, there were 5 billion shares of Common Stock authorized with a stated value of $0.001 per share, of which approximately 4,815,363,072 shares were issued and outstanding, with 184,636,928 shares authorized but unissued. Each holder of Unico's Common Stock is entitled to one vote for each share held of record on all matters submitted to the vote of stockholders, including the election of directors. All voting is non-cumulative, which means that the holder of fifty percent (50%) of the shares voting for the election of the directors can elect all the directors. The holders of Common Stock are entitled to receive pro rata dividends, when and as declared by the Board of Directors in its discretion, out of funds legally available therefore, but only if all dividends on the Preferred Stock have been paid in accordance with the terms of such Preferred Stock and there exists no deficiency in any sinking fund for the Preferred Stock.

Dividends on the Common Stock are declared by the Board of Directors. The payment of dividends on the Common Stock in the future, if any, will be subordinate to the Preferred Stock and will be determined by the Board of Directors. In addition, the payment of such dividends will depend on the Company's financial condition, results of operations, capital requirements and such other factors as the Board of Directors deems relevant.

PREFERRED STOCK

As of the Record Date, the Company has 20,000,000 shares of Preferred Stock designated. The Board of Directors has sole discretion in designating the preferences, limitations and relative rights of the Preferred Stock. The Company presently has one (1) class or series of Preferred Stock outstanding.

*Series A Preferred Stock* – The Company has ten million (10,000,000) shares of Series A Preferred Stock designated. Each share of Series A Preferred Stock is convertible into shares of the Company's Common Stock on a one-for-one (1:1) basis, and the conversion ratio is not affected by forward or reverse stock splits. The Series A Preferred Stock is non-interest bearing, does not have voting rights and is not entitled to receive dividends. In the event of a liquidation event, the Series A Preferred Stock automatically converts into Common Stock based on the foregoing formula. Holders of the Series A Preferred Stock are entitled to elect two (2) persons to the Company's Board

of Directors. As of the Record Date, there were 9,800,000 shares of Series A Preferred Stock outstanding.

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth, as of November 8, 2007 the beneficial ownership of the Company's Common Stock (i) by any person or group known by the Company to beneficially own more than 5% of the outstanding Common Stock, (ii) by each Director and executive officer and (iii) by all Directors and executive officers as a group. Unless otherwise indicated, the holders of the shares shown in the table have sole voting and investment power with respect to such shares. The address of all individuals for whom an address is not otherwise indicated is 8880 Rio San Diego Drive, 8th Floor, San Diego, California 92108.

| Name and Address | Number of Shares Beneficially Owned | Class | Percentage of Class |
|---|---|---|---|
| Mark A. Lopez Chief Executive Officer | 50,000 5,401,968 | Common Series A Preferred | * 55% |
| Wayne Ash President | 2,000 | Common | * |
| Wayne Hartle Secretary and Director | 2,994,224 348,989 | Common Series A Preferred | * 4% |
| Kenneth C. Wiedrich Chief Financial Officer | 0 | Common | 0% |
| Ray Brown Director | 16,227,474 3,549,043 | Common Series A Preferred | * 36% |
| All directors and executive officers (5 persons) | 19,273,698 9,300,000 | Common Series A Preferred | *% 95% |
| *Denotes less than 1% | | | |

This table is based upon information derived from our stock records. Unless otherwise indicated in the footnotes to this table and subject to community property laws where applicable, the Company believes that each of the shareholders named in this table has sole or shared voting and investment power with respect to the shares indicated as beneficially owned. Applicable percentages are based upon 4,815,363,072 shares of Common Stock and 9,800,000 shares of Series A Preferred Stock outstanding as of November 8, 2007.

AVAILABLE INFORMATION

The Company is subject to the periodic reporting requirements of the Securities Exchange Act of 1934, as amended, and, in accordance therewith, files reports and other information with the Commission. Such reports and other information can be inspected and copied at the public reference facilities maintained by the Commission at 100 F Street, N.E., Washington, D.C. 20549, at prescribed rates. Please call the Commission at (202) 942-8090

11

for further information. Copies of such materials may also be accessed electronically by means of the Commission's home page on the Internet at "http://www.sec.gov."

## OTHER BUSINESS

The board of directors knows of no other matters to be presented at the special meeting.  If any other matter does properly come before the special meeting, the appointees named in the proxies will vote the proxies in accordance with their best judgment.

## SHAREHOLDER PROPOSALS

Proposals of shareholders that are intended to be presented at Unico's next annual meeting of shareholders must have been received by the Company not later than a reasonable time before Unico begins to print and mail its proxy materials under the provisions of Rule 14a-8 of the Securities Exchange Act of 1934.  Unico intends that its next annual meeting of shareholders shall be held in July, 2008.

The person presiding at the next annual meeting of shareholders may refuse to permit to be brought before the meeting any shareholder proposal not made in compliance with Rule 14a-8.

## INFORMATION INCORPORATED BY REFERENCE

The SEC allows the Company to incorporate by reference information that the Company files with the SEC.  Unico incorporates by reference the information contained in Unico's Annual Report to Stockholders on Form 10-KSB for the fiscal year ended February 28, 2007 filed with the SEC on June 13, 2007 and mailed with this proxy statement.

THE COMPANY WILL FURNISH WITHOUT CHARGE A COPY OF ITS ANNUAL REPORT ON FORM 10-KSB FOR THE FISCAL YEAR ENDED FEBRUARY 28, 2007 TO ANY SHAREHOLDER OF THE COMPANY UPON WRITTEN REQUEST.  REQUESTS SHOULD BE SENT TO MARK A. LOPEZ, 8880 RIO SAN DIEGO DRIVE, 8TH FLOOR, SAN DIEGO, CALIFORNIA 92108.

## ANNUAL REPORT

A copy of Unico's Annual Report to Shareholders on Form 10-KSB for the fiscal year ended February 28, 2007, including financial statements, accompanies this notice of special meeting and proxy statement.

THE COMPANY WILL FURNISH WITHOUT CHARGE A COPY OF ITS ANNUAL REPORT ON FORM 10-KSB FOR THE FISCAL YEAR ENDED FEBRUARY 28, 2007 TO ANY SHAREHOLDER OF THE COMPANY UPON WRITTEN REQUEST.  REQUESTS SHOULD BE SENT TO MARK A. LOPEZ, 8880 RIO SAN DIEGO DRIVE, 8TH FLOOR, SAN DIEGO, CALIFORNIA  92108.

Dated: November 27, 2007
San Diego, California

UNICO, INCORPORATED

PROXY FOR SPECIAL MEETING TO BE HELD ON DECEMBER 21, 2007
THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned hereby appoints Mark A. Lopez as proxy, with the power to
appoint their substitute(s), to represent and to vote all the shares of
common stock of Unico, Incorporated, an Arizona corporation (the "Company"),
which the undersigned would be entitled to vote, at Unico's special meeting
of stockholders to be held on December 21, 2007 and at any adjournments
thereof, subject to the directions indicated on the reverse side hereof.

In their discretion, the proxy is authorized to vote upon any other matter
that may properly come before the meeting or any adjournments thereof.

THIS PROXY WILL BE VOTED IN ACCORDANCE WITH THE SPECIFICATIONS MADE, BUT IF
NO CHOICES ARE INDICATED, THIS PROXY WILL BE VOTED FOR THE PROPOSAL LISTED ON
THE REVERSE SIDE.

IMPORTANT--This Proxy must be signed and dated on the reverse side.

13

SPECIAL MEETING OF SHAREHOLDERS OF
UNICO, INCORPORATED

December 21, 2007

THIS IS YOUR PROXY
YOUR VOTE IS IMPORTANT!

Dear Stockholder:

We cordially invite you to attend the Special Meeting of Stockholders of
Unico, Incorporated to be held at 10:00 a.m. local time on December 21, 2007,
at the Hilton San Diego Mission Valley, 901 Camino del Rio South, San Diego,
California, 92108.  Please read the proxy statement which describes the
proposals and presents other important information, and complete, sign and
return your proxy promptly in the enclosed envelope.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE PROPOSALS

PLEASE SIGN, DATE AND RETURN PROMPTLY IN THE ENCLOSED ENVELOPE.
PLEASE MARK YOUR VOTE IN BLUE OR BLACK INK AS SHOWN HERE [x]

|  |  | FOR | AGAINST | ABSTAIN |
|---|---|---|---|---|
| 1. | Proposal to authorize the Board of Directors, in its discretion, to effect a reverse stock split of the Company's Common Stock at a ratio of up to one-for-five hundred during the six month period following the vote of the Special Meeting of Shareholders. | [_] | [_] | [_] |

2.  To transact such other business as may properly come before the special
    meeting and any adjournment or adjournments thereof.

    The board of directors recommends you vote "FOR" the above proposal.

This proxy when properly executed will be voted in the manner directed above.
In the absence of direction for the above proposal, this proxy will be voted
"FOR" that proposal.  Other matters: in their discretion, the appointed
proxies are authorized to vote upon such other business as may properly come
before the meeting.

If you plan to attend the special meeting of shareholders, please mark this
box [_]

Dated:_____, 2007

SIGNATURE _____

NAME (PRINTED) _____

TITLE _____

14

Important: Please sign exactly as name appears on this proxy.  When signing
as attorney, executor, trustee, guardian, corporate officer, etc., please
indicate full title.

EXHIBIT "A"

ARTICLES OF AMENDMENT
to the
ARTICLES OF INCORPORATION
of
UNICO, INCORPORATED

Pursuant to the provisions of the Arizona Code, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation:

FIRST:  The name of the corporation is Unico, Incorporated.

[Paragraph "SECOND" below, shall only be completed and included if and when Unico's Board of Directors adopts a Reverse Split.]

SECOND:  That the presently issued and outstanding Common Stock of the corporation, $.001 par value, shall, at __:__ a.m., Eastern Time, on _____, 2008 (the "Effective Time"), be deemed to be "reverse split," and in the furtherance thereof, there shall, after the Effective Time, be deemed to be issued and outstanding one (1) share of the Common Stock of the Corporation for and instead of each _____ (_) shares of the Common Stock of the Corporation issued and outstanding immediately prior to the Effective Time.  To the extent that any shareholder shall be deemed after the Effective Time as a result of this Amendment to own a fractional share of Common Stock, such fractional share shall be deemed to be one whole share.  Each shareholder of record as of the Effective Time shall be entitled to receive from the Corporation's transfer agent a certificate representing the number of shares of the Common Stock to which such shareholder is entitled hereunder upon delivery to the Corporation's transfer agent of a certificate or certificates representing the number of shares owned by such shareholder of record as of the Effective Time.

THIRD:  The foregoing amendment was adopted by the vote of the shareholders on December 21, 2007.

FOURTH:  The number of shares of the Corporation outstanding at the time of such adoption was 4,815,363,072 common shares (1 vote per share) and 9,800,000 Series A Preferred Shares (non-voting); and the number of shares entitled to vote thereon was 4,815,363,072. The number of shares indisputably represented at the meeting where the vote occurred was [_____].

FIFTH:  The number of shares voted for such amendment was [_____]; and the number of shares voted against such amendment was [_____].  [_____] shares abstained.  The number of shares voted for the amendment was sufficient for approval of the amendment.

SIXTH: The foregoing amendment does not effect an exchange, reclassification or cancellation of shares.

SEVENTH: The amount of stated capital after the amendment is $_____.

16

Dated this _____ day of _____, 2008

UNICO, INCORPORATED

By _____
    Its Chief Executive Officer

and _____
    Its Secretary

STATE OF CALIFORNIA   )
                     : ss.
COUNTY OF SAN DIEGO   )

    I, _____, Notary Public, do hereby certify that on this __, day of _____, 2008 personally appeared before me Mark A. Lopez who being by me first duly sworn, declared that he is the Chief Executive Officer of Unico, Incorporated, that he signed the foregoing document as Chief Executive Officer of the Corporation, and that the statements therein contained are true.

_____
Notary Public
Residing at: _____
My Commission Expires: _____

SEC\0816.1

17

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-KSB

[X] Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act
of 1934 For the Fiscal Year Ended February 28, 2007

*Commission File Number: 000-30239*
**UNICO, INCORPORATED**
(Exact name of small business issuer in its charter)

| | |
|---|---|
| **Arizona** | **13-4171971** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**8880 Rio San Diego Drive, 8th Floor, San Diego, California 92108**
(Address of principal executive offices)    (Zip code)

**(619) 209-6124**
(Issuer's telephone number, including area code)
**N/A**
(former name or former address, if changed since last report)

Securities registered under Section 12(b) of the Exchange Act:

| | |
|---|---|
| None | N/A |
| (Title of each class) | (Name of Exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Exchange Act:

Common Stock, $0.001 par value
(Title of Class)

Check whether the issuer (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes [ X ]  No [   ]

Check if there is no disclosure of delinquent filers in response to Item 405 of Regulation S-B contained in this form, and no disclosure will be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-KSB or any amendment to this Form 10-KSB. [X]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes [   ]  No [X]

The issuer reported no net revenues for the fiscal year ended February 28, 2007.

The aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was sold, or the average bid and asked prices of such common equity as of June 11, 2007 was $3,963,618, based on the last sale price of $0.0021 as reported on the OTC bulletin board.

The Registrant had 1,906,735,609 shares of common stock, $0.001 par value, outstanding as of June 11, 2007.

Transitional Small Business Disclosure Format (Check One)  Yes [   ]  No [X]

1

# TABLE OF CONTENTS

### PART I

| | PAGE |
|---|---|
| ITEM 1  DESCRIPTION OF BUSINESS | 3 |
| ITEM 2.  DESCRIPTION OF PROPERTY | 12 |
| ITEM 3.  LEGAL PROCEEDINGS | 16 |
| ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 17 |

### PART II

| | |
|---|---|
| ITEM 5.  MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS | 17 |
| ITEM 6.  MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION | 18 |
| ITEM 7. FINANCIAL STATEMENTS | 21 |
| ITEM 8. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 21 |
| ITEM 8A. CONTROLS AND PROCEDURES | 22 |
| ITEM 8B. OTHER INFORMATION | 22 |

### PART III

| | |
|---|---|
| ITEM 9.  DIRECTORS AND EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS; COMPLIANCE WITH SECTION 16(a) OF THE EXCHANGE ACT | 22 |
| ITEM 10.  EXECUTIVE COMPENSATION | 24 |
| ITEM 11.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 25 |
| ITEM 12.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 26 |
| ITEM 13.  EXHIBITS | 26 |
| ITEM 14.  PRINCIPAL ACCOUNTANT FEES AND SERVICES | 29 |
| SIGNATURES | 30 |

2

PART I

**Forward Looking Statements**

This document includes statements that may constitute forward-looking statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. The Company would like to caution certain readers regarding certain forward-looking statements in this document and in all of its communications to shareholders and others, on management's projections, estimates and all other communications. Statements that are based on management's projections, estimates and assumptions are forward-looking statements. The words believe, expect, anticipate, intend and similar expressions generally identify forward-looking statements. While the Company believes in the veracity of all statements made herein, forward-looking statements are necessarily based upon a number of estimates, and assumptions that, while considered reasonable by the Company, are inherently subject to significant business, economic and competitive uncertainties and contingencies and known and unknown risks. Many of the uncertainties and contingencies can affect events and the Company's actual results and could cause its actual results to differ materially from this expressed in any forward-looking statements made by, or on behalf, of the Company.

**Reverse Stock Split**

Effective August 11, 2006, the Company's common stock underwent a 1 for 100 reverse stock split. As a result, the number of outstanding shares of the Company's common stock as of August 11, 2006 decreased from approximately 4,954,096,450 pre-reverse split shares to approximately 49,540,965 post-reverse split shares. Share figures appearing in this report are generally expressed in numbers of post-reverse split shares, unless otherwise indicated.

**ITEM 1.        DESCRIPTION OF BUSINESS**

**General**

Unico, Incorporated ("the Company", "Unico" or "UNCN") an Arizona corporation, was formed as an Arizona corporation on May 27, 1966. It was incorporated under the name of Red Rock Mining Co., Incorporated. It was later known as Industries International, Incorporated and I.I. Incorporated before the name was eventually changed to Unico, Incorporated in 1979.

On July 12, 2004, Unico filed an election with the U.S. Securities and Exchange Commission to become a business development company ("BDC") pursuant to Section 54 of the Investment Company Act of 1940. On August 1, 2005, the Board of Directors unanimously approved a proposal to withdraw the Company's election to be treated as a business development company as soon as practicable so that Unico could begin conducting business as an operating company rather than as a business development company subject to the Investment Company Act. On October 11, 2005, a Special Meeting of the Unico shareholders was held to consider and vote upon a proposal to authorize the Company's Board of Directors to withdraw the Company's election to be treated as a BDC and the proposal was approved. On October 12, 2005 a Notification of Withdrawal was filed with the Securities and Exchange Commission so that Unico could begin conducting business as an operating company rather than as a BDC subject to the Investment Company Act.

The mining operations at the Deer Trail Mine have been conducted through Unico's subsidiary, Deer Trail Mining Company, LLC ("Deer Trail Mining Company" or "DTMC") since soon after DTMC was formed in late June, 2004. The mining operations at the Bromide Basin Mines have been conducted through Unico's subsidiary, Bromide Basin Mining Company, LLC ("Bromide Basin Mining Company" or "BBMC") since soon after BBMC was formed in late June, 2004. Future mining operations at the Silver Bell Mine will be conducted through Unico's subsidiary, Silver Bell Mining Company, Inc. ("SBMC").

Deer Trail Mining Company, LLC

On March 30, 1992, Unico, Incorporated entered into a Mining Lease and Option to Purchase agreement with Deer Trail Development Corporation, with headquarters in Dallas, Texas. Deer Trail Development Corporation is now known as Crown Mines, L.L.C. The lease was to run for a period of 10 years, and cover 28 patented claims, 5 patented mill sites and 171 unpatented claims located approximately 5 miles South of Marysvale, Utah. It includes mine workings known as the Deer Trail Mine, the PTH Tunnel and the Carisa and Lucky Boy mines. There are no known, proven or probable reserves on the property.

Effective December 1, 2001, a new lease agreement was entered into between the parties covering the same property for a period of thirty (30) months. It was subsequently amended and extended through a series of amendments, with the most recent amendment, the Fourth Modification of Mining Lease and Option to Purchase being executed on April 26, 2007. It extended the lease term and option to purchase through May 31, 2007. Unico and Crown Mines are presently negotiating the final sale agreement covering the sale of the Deer Trail Mine Claims. A copy of this Amendment is attached to this Form 10-KSB as Exhibit 10.74.

3

In August 2006, Deer Trail Mining Company entered into a Mining Lease with Joel Johnson covering the Clyde, Clyde Intermediate and Crown Point claims. These claims are located near the Deer Trail Mine. Deer Trail Mining Company has leased the claims for the purpose of conducting mine exploration, evaluation, and possible mining activities on the claims. The Mining Lease is for two years, with options to extend the lease for 50 additional one year periods. Under the terms of the Mining Lease, Deer Trail Mining Company paid initial down payments totaling $31,000 with $4,000 due in the second year of the lease. If Deer Trail Mining Company elects to extend the lease, it must pay $3,000 for the first extension year, and the annual lease extension payment increases ten percent (10%) per year thereafter. Additionally, Deer Trail Mining Company will pay three percent (3%) of the gross sale proceeds from the sale of any ore concentrates, or other mineral resources extracted from the claims.

In September 2006, Deer Trail Mining Company entered into a Non-Patented Mining Claims Lease covering approximately 70 additional claims covering approximately 1,500 acres in Piute County Utah for the purpose of exploration, evaluation and mining activities. In consideration for the rights under the agreement, the Deer Trail Mining Company agreed to pay the lease holders $7,000 per year for each of the first three years. Deer Trail Mining Company has the right to extend the lease for 50 additional one year periods. If extended by Deer Trail Mining Company, the annual lease payment is $10,000 in each of years four and five, and thereafter the annual lease payment increases by ten percent (10%) per year. In addition to the annual lease payments, Deer Trail Mining Company has also agreed to pay an amount equal to three percent (3%) of the gross sales proceeds from all ore, concentrates, and all other productions of mineral resources extracted from the claims. The agreement contains an option to purchase the claims exercisable at $350,000 during the five first years of the lease. The exercise price increases $50,000 per year thereafter. It may only be exercised while the lease is effective.

Following the formation of the Deer Trail Mining Company in June 2004, Unico assigned all of the various assets, liabilities and operations associated with the Deer Trail Mine to Deer Trail Mining Company which has assumed responsibility for making payments under the Deer Trail Lease.

Since June 2004 Deer Trail Mining Company has assumed operations, ownership and management control of the Deer Trail Mine. Deer Trail Mining Company presently has 12 full time employees, 1 part time employees and 7 consultants.

The necessary permits to commence mining activities at the Deer Trail Mine have been acquired, provided that the surface disturbance from the mining activities does not exceed 10 acres for both mine and mill. In early 2005, Unico and Deer Trail Mining Company, received approval of the company's Large-Scale Mining Permit for the Deer Trail Mine in Marysvale, Utah. The State of Utah's Division of Oil, Gas and Mining granted approval of the company's application to expand its existing small mining project to a large mining operation, which is expected to significantly increase the area of mining activity and the capacity of the company's mill at the Deer Trail Mine. This Large-Scale permit takes the place of the previous two Small-Scale permits described above. In 2004, Unico filed to obtain a construction permit with the State of Utah Department of Environmental Quality (both the Utah Division of Air Quality and the Utah Division of Water Quality) for the Deer Trail Mine tailings impoundment pond no. 2.

Unico worked for more than two years to reopen the Deer Trail Mine. Unico commenced mining activities in late March or early April 2001 on the Deer Trail Mine. To date, the mining activities have been fairly limited. There have been between 2 and 5 miners at various times working full time in the Deer Trail Mine both on mine development work and production work until approximately October 2003. Their efforts were concentrated in the 3400 Area of the mine, from which they removed approximately 1,000 tons of ore per month. The ore has been stock-piled and some of it has been crushed. Some of the employees have worked on mine maintenance.

Unico completed a mill on site at the Deer Trail Mine. In November 2001, Unico began milling activities. Unico started screening and crushing ore dumps on the upper Deer Trail Mine and moved the materials to the ball mill. Currently the Deer Trail Mining Company is reconstructing the mill to enhance productivity and efficiency. In July 2006, Deer Trail Mining Company completed the upgrades to the screening plant and began screening the ore dumps at the upper Deer Trail Mine. Once screened, the material is moved to the mill facility and stockpiled for further processing. The Company anticipates running this material through its mill once reconstruction is complete.

We believe that there are a variety of mining companies and other mineral companies that are potential purchasers for the lead concentrates, zinc concentrates and other concentrates which we intend to sell as the end product from our Deer Trail Mine mining and milling operations. The concentrates can be transported by either rail or truck, and there are a variety of trucking companies that are willing and able to transport concentrates to smelters or other places designated by purchasers.

4

In September 2004, Deer Trail Mining Company completed its first phase of exploratory drilling at the Deer Trail Mine. The Deer Trail Mining Company contracted Lang Exploratory Drilling to complete the phase of drilling. Lang completed a total of 3,653 feet of reverse circulation drilling and finished 28 drill holes at specified targets located on the Upper Deer Trail Mine. 741 samples were safeguarded by Lang Exploratory Drilling during this phase and shipped to ALS Chemex at its Elko, Nevada facility for independent lab verification and analysis.

The first phase of exploration drilling was designed to identify near surface deposits, determine potential resources and define limits of mineralization south of the main ore channel mined at the Upper Deer Trail Mine. Historical data of the workings was sufficient to delineate the grade of mineralization remaining in the stopes, but no data was available to delineate the grade of mineralization outside the workings or how far that mineralization flowed into the surrounding formations. The initial phase of reverse circulation drilling serves as an adequate means to define the limits of mineralization south of the main ore channel, which is situated in the lower Toroweap formation, along the crest and down the northeast limb of the Deer Trail anticline.

This phase of drilling was accomplished with lower cost reverse circulation drill holes in order to establish the presence of mineralization at the Upper Deer Trail area. Once the limits of mineralization are established, work can begin to further define those zones by diamond core drilling. This initial phase of drilling is considered merely a starting point in generating data for pre-feasibility and feasibility studies for the Deer Trail Mine operations.

The most upper holes RC-1 through RC-7 were placed well above the elevation of the known workings of the No. 2 Tunnel and slightly south of the northwesterly trending ore channel. Significant mineralization was intercepted in holes RC-1 and RC-2, which were drilled in the area closest to the main ore channel.

Drill holes RC-5, 6, 8, 9, 13 and 14 were all drilled well south of the historically delineated mineralization, and on the southern most up-side of a post mineral fault. It can be concluded that mineralization intercepted in these holes is not directly related to the mineralization of the main Upper Deer Trail ore channel.

| Hole | Interval | | Gold | Silver | Lead | Zinc |
|------|----------|------|------|--------|------|------|
| | From - to | (ft) | (grams/troy oz.) | (grams/Troy oz.) | (%) | (%) |
| RC-1 | 190 – 230 | 40 | 0.207 | 10.98 | 0.355 | 0.205 |
| RC-2 | 40 - 45 | 5 | 0.364 | 95.36 | 3.61 | 0.390 |
| Includes | 175 - 180 | 5 | 0.369 | 45.71 | 2.87 | 1.41 |
| RC-10 | 65 - 95 | 30 | 0.363 | 16.48 | 0.086 | 0.022 |
| RC-11 | 60 - 70 | 10 | 1.36 | 52.25 | 0.758 | 0.191 |
| Includes | 65 - 70 | 5 | 2.26 | 32.69 | 0.961 | 0.289 |
| RC-12 | 85 - 90 | 5 | 0.460 | 137.14 | 3.94 | 1.00 |
| RC-17 | 55 - 65 | 10 | 0.799 | 13.02 | 0.033 | 0.012 |
| RC-18 | 45 - 50 | 5 | 1.54 | 40.77 | 0.154 | 0.018 |
| RC-19 | 0 – 140 | 140 | 0.527 | 14.65 | 0.116 | 0.107 |
| Includes | 35 - 45 | 10 | 2.64 | 14.11 | 0.840 | 1.26 |

| | | | | | |
|---|---|---|---|---|---|
| Includes | 35 - 40   5 | 4.66 | 21.15 | 1.30 | 2.14 |
| Includes | 75 - 120   45 | 0.930 | 34.86 | 0.135 | 0.021 |
| Includes | 95 - 105   10 | 3.17 | 88.63 | 0.303 | 0.019 |
| Includes | 100 - 105   5 | 4.78 | 151.02 | 0.682 | 0.008 |
| RC-20 | 95 – 100   5 | 1.92 | 62.02 | 0.218 | 0.030 |
| RC-21 | 95 - 110   15 | 0.899 | 74.29 | 0.145 | 0.014 |
| RC-22 | 110 - 120   10 | 1.77 | 18.14 | 0.074 | 0.024 |
| Includes | 115 - 120   5 | 3.25 | 27.52 | 0.079 | 0.014 |

5

In early 2005, Deer Trail Mining Company contracted with Connors Drilling to commence an underground diamond core drill program. This 2nd phase of exploratory drilling inside the PTH Tunnel of the Deer Trail Mine has been completed. The Phase II underground diamond core drilling program was primarily designed to target known horizons of mineralization and identify new mineralized horizons throughout the main ore channel of the Deer Trail Mine. The Company completed 7,235 feet of diamond core drilling and finished 13 underground drill holes. According to preliminary reports by the Company's geologist, all of the holes drilled were reported to intersect mineralization within their designated targets. That report states that a total of approximately 514 feet of mineralization was intersected and consisted mostly of sulfide minerals (e.g. tetrahedrite, galena, pyrite, chalcopyrite and sphalerite). Other intercepts were encountered through oxidized mineral not reported in this total, as well as zones of subtly altered rock that may contain high mineral values and offer significant potential. The company is now working on final independent core logging and splitting verification. Once complete, it plans to ship its core samples to an independent lab for analysis.

In March 2006, Deer Trail Mining Company, LLC entered into an agreement with Behre Dolbear and Company (USA), Inc. to conduct geological services and consulting at Unico's Deer Trail Mine in Marysvale, Utah. The focus of Behre Dolbear's work is related to the underground diamond core drilling program undertaken at the Deer Trail Mine in 2005. Behre Dolbear is currently performing the geological core logging and spitting verification on the samples and overseeing the shipment of those samples to ALS Chemex for analysis. Behre Dolbear has also been contracted to report on the mineralization and provide additional technical advice on the project as desired by Deer Trail Mining Company, LLC.

Behre Dolbear and Company (USA) has issued the following information from the Interim Summary Report on their work completed thus far. The report from Behre Dolbear states:

"Unico, Incorporated drilled 7,235 feet of BQ diameter core at various inclinations and azimuths from four drill stations in the Patrick Thomas Henry (PTH) adit at the Deer Trail Mine from December 2004 to April 2005. At that time, the core was not logged in detail and no analyses were done. Table 1 summarizes the drilling statistics. The station locations are defined based on the approximate footage from the PTH adit portal.

**Table 1**
**Unico Phase II Drill Holes**

| UDDH Drill Hole # | Station Location | Inclination (in degrees) | Azimuth | Total Length (Feet) |
|---|---|---|---|---|
| 1* | 4400 | -45 | 102 | 740 |
| 2 | 4400 | -40 | 102 | 648 |
| 3* | 4400 | -42 | 92 | 782 |
| 4* | 4400 | -42 | 150 | 554 |
| 5* | 4400 | -55 | 102 | 664 |
| 6 | 4400 | -45 | 21 | 409 |
| 7 | 4400 | -58 | 298 | 733 |
| 8 | 4400 | -75 | 300 | 565 |
| 9* | 4700 | -45 | 116 | 460 |
| 10 | 4900 | -75 | 0 | 460 |
| 11* | 3400 | +45 | 258 | 454 |
| 12* | 3400 | +45 | 162 | 355 |
| 13* | 3400 | -65 | 125 | 420 |
| Total Footage | | | | 7,235 |

*Logged by Behre Dolbear

6

Behre Dolbear & Company (USA), Inc. (Behre Dolbear) contracted with Unico in March 2006 to geologically log the core, select intervals for analyses and assays, supervise the sawing of the selected intervals, submit those samples to a laboratory for analyses, opine on the mineralization observed, and provide technical advice to Unico. Between March 23, 2006 and October 6, 2006, Behre Dolbear logged in detail 4,429 feet of core from the eight holes indicated in Table1. A total of 550 samples totaling 611 feet of core containing trace to significant mineralization from six of the holes (UDDH 1, 5, 9, 11, 12, and 13) has been selected, sawed, submitted for analyses and assays, and the results received and evaluated. Analyses are pending from 228 samples from 385 feet of core in UDDH 3. UDDH 4 has been logged, but sample intervals have not been selected.

ALS Chemex (Chemex) did the analyses and assays at its laboratory in North Vancouver, British Columbia. Sample preparation, analyses, and assays were done as requested by Behre Dolbear using Chemex's standard protocols. Gold was determined by fire assay with an atomic absorption spectrometry (AAS) finish. All samples were also analyzed for a 34-element suite of major and potentially significant trace elements using an aqua regia digestion and an emission spectrographic scan. Chemex's quality control-quality assurance system complies with the requirements of the international standards ISO 90001:2000 and ISO17025:1999.

The Pennsylvanian Callville Limestone is the host of the mineralization in the holes logged by Behre Dolbear at the Deer Trail Mine. Behre Dolbear has logged over 4,400 feet of core that traverses the various lithologies of the upper +700 feet of that

formation. This detailed logging has resulted in the recognition of ten previously unrecognized informal members and/or other subdivisions that will enable future work to place the mineralized horizons in the vicinity of the mine into stratigraphic perspective.

The mineralization in the Callville Limestone typically consists of stratabound narrow conformable bands of semi-massive to massive sulfides separated by relatively long intervals of weakly mineralized to barren rock. Ore minerals include sphalerite, galena, chalcopyrite, and tetrahedrite-tennantite. Where the significantly mineralized zones are thicker, the mineralized bands are closer together.

Based on the analytical results received to date, Behre Dolbear combined 33 continuous assay intervals from six holes into gross assay intervals ranging from 2.3 feet to 95 feet in length, uncorrected to true stratigraphic width. Intervals within the gross intervals were combined into 113 detailed intervals based on their grades.

The best intervals based on thickness and grades in multiple metals in the six holes from which analyses have been received are listed in Table 2.

Table 2 shows that significant mineralization in most of the holes is confined to relatively narrow intervals ranging from 1.0 feet to 10.6 feet. The thickest intercept with significant mineralization is in UDDH 12 at 55.2 feet. The intervals are uncorrected for the true widths of the intercepts and will all be thinner than stated, some possibly as much as fifty percent thinner. Overall, silver contributes the most value of the metals in Table 2 with zinc second and gold, copper, and lead contributing subordinate values. In some of the intervals, the silver and gold are high but the base metals are low. Copper contributes more value than zinc in some of these intervals. Only one of the intervals (UDDH 11 at 105.0 to 110.6 feet) has high values in all of the metals. The highest gold and silver values are in UDDH 1 (5.273 ppm Au=0.167oz/t Au; 366.9 ppm Ag= 10.71 oz/t Ag), and UDDH 11 (4.564 ppm Au= 0.133 oz/t Au; 585.1 ppm Ag= 17.08oz/t Ag).

Table 2
Best Interval from Each Analyzed Hole

| UDDH | Analyzed From | Analyzed To | Interval (Feet) | Au (ppm) | Ag (ppm) | Cu (%) | Pb (%) | Zn (%) |
|---|---|---|---|---|---|---|---|---|
| 1 | 365.5 | 370.4 | 4.9 | 5.723 | 366.9 | 0.01 | 0.16 | 0.42 |
| | 406.6 | 417.2 | 10.6 | 1.062 | 177.6 | 0.11 | 0.58 | 1.58 |
| | 456.0 | 462.5 | 6.5 | 0.350 | 156.4 | 0.24 | 1.38 | 2.08 |
| 5 | 322.0 | 327.0 | 5.0 | 0.870 | 164.1 | 0.25 | 2.09 | 1.27 |
| | 419.0 | 419.9 | 0.9 | 1.510 | 116.0 | 0.27 | 0.35 | 0.18 |
| 9 | 293.7 | 300.1 | 6.4 | 0.372 | 46.8 | 0.15 | 1.28 | 1.78 |
| | 434.6 | 435.6 | 1.0 | 0.310 | 102.0 | 0.39 | 5.20 | 6.59 |
| 11 | 7.7 | 13.4 | 5.7 | 4.564 | 585.1 | 0.45 | 0.71 | 0.83 |
| | 105.0 | 110.6 | 5.6 | 1.600 | 550.6 | 0.96 | 2.0 | 2.43 |
| 12 | 5.8 | 61.0 | 55.2 | 0.608 | 183.1 | 0.44 | 0.40 | 0.67 |
| | 220.0 | 221.9 | 1.9 | 2.170 | 128.0 | 0.01 | 0.01 | 3.32 |
| 13 | 77.9 | 78.9 | 1.0 | 0.380 | 188.0 | 0.60 | 3.10 | 3.89 |

7

There is potential for an economic deposit at the Deer Trail Mine if the metals occur together in significant grades and in widths (generally greater than 10 feet) that are adequate for mining. Additional work is required to determine if those conditions exist. Before additional drilling is done, the results of the logging, analyses, and observations by Behre Dolbear should be combined with the data and results from previous work to develop a three-dimensional model of the deposit. Development of that model will require data from surface and underground mapping, previous mining, and drilling from this and previous campaigns. All of this data on lithologies, structures, mineralization, and alteration must be put together on maps and cross sections to build the model. Based on that model, the geometry (true widths and lateral extents) and grades of the mineralization as currently known will be indicated and decisions can be made if additional drilling has the potential to define economically mineable mineralization. It has not been determined if there is adequate data available from previous work to construct a good model."

In November 2006, Deer Trail Mining Company modified and expanded the agreement with Behre Dolbear and Company (USA), Inc. for geological services at Unico's Deer Trail Mine. The new agreement and work order adds several new areas of consulting that will fall under Behre Dolbear's scope of services on the Deer Trail project. Under these new revisions Behre Dolbear will assemble all the available data relating to the locations, volumes, and grades of the tailings that Deer Trail intends to process through the Project's mill. Based on the information available, Behre Dolbear will estimate the volumes, tonnages, and grades of those tailings and will, if needed, recommend a drilling program to better define those tonnages and grades. Behre Dolbear will summarize the results of the drill core logging completed to date and correlate those results with pertinent assays of material from those holes to determine the factors from the logging that relate to and facilitate the location of significant mineralization. With Deer Trail's assistance, Behre Dolbear will assemble all the available data (mineralization, rock types, structure, alteration, etc.) from past drilling and mining, focusing on the 3100-3400 zone in the PTH adit, i.e., the Proctor Stope and Proctor Stope Extension, which is the zone most easily accessible for near-term mining. Behre Dolbear will correlate data from the extant logging effort and assays with the data from past drilling and mining to locate and model, to the extent possible, potentially mineable mineralization in the 3100-3400 zone. Behre Dolbear will determine if logging of the holes not yet logged in the 4400 zone of the PTH adit is warranted, based upon the logging to date of holes in that zone and any available data from past drilling and mining. Behre Dolbear will assist Deer Trail with judgments and potential approaches to exploitation of the Toroweap Sandstone in the 8600 area of the PTH adit. (It appears that this area has the greatest potential for hosting high grade, large tonnage mineralization at the Deer Trail Mine. That area is, however, the portion of the existing workings that is least accessible for mining in the near term.) The agreement calls for additional personnel and support for Behre Dolbear's work at the Deer Trail Mine. Further, the modifications call for reorganizing and redirecting site efforts that have heretofore focused specifically on the logging, chemical analyses, and interpretation of the drill cores. Behre Dolbear will focus on those aspects of the expanded work scope that will most quickly lead to the definition and potential reporting of ore reserves in the form of mine tailings. They will also focus strongly on the development of mineralization models that facilitate judgments regarding the 3100-3400 area of the PTH adit and the timing of work in the 8600 area.

On August 31, 2005, Deer Trail Mining Company entered into a five-year purchase contract with PGM, LLC of Los Angeles under which PGM will purchase precious metal bearing concentrates from the Deer Trail processing center. Most sales will not occur until the mill processing center is complete at the Deer Trail Mine. PGM has advanced Deer Trail Mining Company $25,000 for an initial shipment of concentrates that will be produced on a pilot plant basis.

Silver Bell Mining Company, Inc.

Silver Bell Mining Company, Inc. was incorporated in the State of Utah on April 26, 1993. It has acquired 26 patented mining claims located in American Fork Canyon, Utah County, Utah, which is organized into three separate parcels. The claims contain mining properties that have not been mined for production since 1983. The properties were mined primarily for silver, lead and zinc. There are no known, proven or probable reserves on the property.

Silver Bell Mining Company conducted some exploration work on the Silver Bell Mine through 2004. Silver Bell Mining Company plans to commence an exploration and resource definition program at the Silver Bell Mine beginning in Summer, 2007. Silver Bell Mining Company may also seek a joint venture mining partner to jointly develop the Silver Bell Mine.

8

Silver Bell Mining Company anticipates that any ore mined from the Silver Bell Mine will be transported to the Deer Trail Mine site where it will be crushed and milled.

In August 2006, Silver Bell Mining Company reached a preliminary agreement for a joint venture with the Polymet Company, LLC for mining at the Silver Bell Mine and executed a letter of intent. Currently, Silver Bell Mining Company and Polymet Company, LLC are negotiating terms on their joint venture, but have not signed a definitive agreement.

<u>Bromide Basin Mining Company, LLC</u>

On July 20, 2001, Unico entered into a Mining Lease and Option to Purchase with Kaibab Industries, Inc., an Arizona corporation. The parties then entered into a Revised Mining Lease and Option to Purchase in April 2003 (the "Revised Kaibab Mining Lease"). Following the formation of the Bromide Basin Mining Company in June 2004, Unico assigned all of its assets, liabilities and operations associated with the Bromide Basin Mines to Bromide Basin Mining Company. A Second Revised Mining Lease and Option to Purchase was entered into with Bromide Basin Mining Company in May 2005 which expired November 1, 2005. Effective May 1, 2006, the parties entered into a Third Revised Mining Lease and Option to Purchase (the "Third Revised Mining Lease"). At that time Unico paid approximately $63,592 to Kaibab Indutries, Inc. for past due lease payments, taxes and BLM fees. Under the Third Revised Mining Lease, Kaibab Industries, Inc. has leased to Bromide Basin Mining Company certain mining claims located in the Henry Mountain Mining District in Garfield County, Utah containing approximately 400 acres, which includes the Bromide Basin Mines. The Third Revised Mining Lease grants to Bromide Basin Mining Company the option to purchase six (6) fully permitted patented mining claims and twenty-one (21) located mining claims comprising in all over 400 acres of Bromide Basin in the Henry Mountain Mining District located in Garfield County, Utah. The option exercise price is $835,000 for all specified mining claims, mill sites and dumps being leased. It expires November 1, 2006, but Bromide Basin Mining Company has the right to extend the lease for one additional year. As consideration for the Third Revised Mining Lease, Bromide Basin Mining Company has agreed to pay Kaibab Industries in advance the sum of $5,000 per month and pay a five percent (5%) net smelter return upon all ore taken from the leased premises each month, to the extent that the amount for any month exceeds the $5,000 monthly base rent. Prior to the Third Revised Mining Lease expiration date of November 1, 2006, Bromide Basin Mining Company formally requested to extend the lease for one additional year. Kaibab Industries accepted the request, and extended the Lease and Option for one year, from November 1, 2006 through October 31, 2007.

The primary purpose of the agreement was to allow Bromide Basin Mining Company access to the claims to conduct an extensive preproduction feasibility study prior to any additional mining production and to analyze the potential of the claims before exercising the purchase option from Kaibab Industries.

The Company has started its pre-production feasibility study, and is currently analyzing the potential of the claims at the Bromide Basin Mines.

**Plan of Operation**

During the next 12 months, Unico's plan of operation is to raise approximately $5,000,000 which Unico intends to invest in its subsidiary companies, Deer Trail Mining Company, Bromide Basin Mining Company and Silver Bell Mining Company. The funds are intended for the following purposes:

- Complete logging and shipment of core samples identified and taken from the completed 2 nd phase of exploratory drilling at the Deer Trail Mine and have them analyzed/certified by an independent lab and consulting firm;
- Continue sampling and analyzing ore from the Deer Trail Mine to evaluate the most efficient means to conduct future mining and milling activities;
- Increase mining activities and upgrade mine infrastructure at the Deer Trail Mine;
- Continue to upgrade and complete the re-construction project on the existing mill at the Deer Trail Mine;
- Upgrade the crushing facility at the upper Deer Trail Mine and continue processing the ore dumps;
- Begin milling and processing activities at the Deer Trail Mine mill facility;
- Acquire new mining equipment to improve operations at the Deer Trail Mine;
- Upgrade and complete modifications to the electrical substation at the Deer Trail Mine;
- Conduct an extensive preproduction feasibility study at the Bromide Basin Mine prior to any additional mining production and analyze the potential of the claims before exercising its purchase option from Kaibab Industries;
- Exercise the purchase option on the Bromide Basin Mine lease;
- Conduct additional survey and mapping work on the Clyde and Crown Point mining claims including improvements to the property and potentially underground and surface exploratory drilling on the claims;
- Commence an exploration and resource definition program at the Silver Bell Mine beginning in 2007; and

- Exercise or extend an option to purchase the Deer Trail Mine for $3,000,000.

9

Accomplishing the 12-month plan of operations is dependent on Unico raising approximately $5,000,000 in equity and/or debt financing during the next 12 months. The Company's cash as of February 28, 2007, will sustain operations for approximately 120 days.

**Plans for 2007 Mining Season**

During the 2007 mining season, Bromide Basin Mining Company intends to make additional preparations to upgrade the infrastructure in and around the mine areas. These improvements will provide more effective access to the general working area of the mines and lay the groundwork for continuous operations through the coming seasons.

In the 2007 season, Bromide Basin Mining Company is looking to increase the production levels of the Bromide Basin mines. To that end, primary planning will include the continuation and completion of the El Padre Tunnel and the development of production headings within the bromide vein. Bromide Basin Mining Company plans to conduct an extensive preproduction feasibility study and analyze the potential of the Claims.

**Smelting and Refining**

All of the smelting and refining of ore will be handled by other companies. Smelters capable of handling the Deer Trail concentrates include the Cominco Lead and Zinc smelters in Trail, British Columbia, Canada, and the Grupo Mexico (formerly Asarco) smelter in Torreon, Mexico. Occasionally, high grade copper-silver concentrates may be sent to the Noranda smelter in Belledune, New Brunswick, Canada.

**Dependence on Metal Prices**

Unico's mining activities will be largely dependent on metal prices. The prices may fluctuate on the world commodity markets and will be beyond the influence of Unico. A substantial reduction in the price of metals might impede Unico's ability to economically mine or to raise additional capital. Similarly, recent increases in metal prices have been beneficial to mining companies, and may increase Unico's ability to acquire new capital.

**Competition**

Unico competes with many mining companies in the U.S. and throughout the world. The majority of Unico's competitors are much larger and better financed than Unico. Some of Unico's competitors have closed mining operations in past years due to low metal prices. Some mining operations have been consolidated through mergers or other acquisitions. Recent increases in metal prices have helped mining companies in expanding operations and in their efforts to acquire new capital.

**Employees**

During the fiscal year ended February 28, 2007 the Company had 13 employees. Through Unico and its subsidiaries, the Company had 12 full time employees, 1 part time employee and 7 consultants. The full time employees include a project manager. Unico believes the number of employees may increase to approximately 20 within the next twelve months. In the event the mining operations are successful, additional employees may be added in the future.

During the fiscal year ended February 28, 2007, management entered into an agreement with Javelin Advisory Group to provide administrative support for a monthly fee of $10,000. In this way, overhead costs are kept at a minimum while still being able have a very talented administrative staff as part of the management team. The agreement expired May 31, 2007 and was not renewed.

**Governmental Regulation**

Mining and/or processing activities are subject to numerous permitting and environmental laws and regulations administered by active federal, state, and local authorities, particularly the Utah Division of Oil, Gas and Mining. Although the permits necessary for mining operations on the patented and unpatented Deer Trail Mine claims and on the patented Silver Bell Mine claims have already been obtained, Unico may be required to expand such permitting in order to fully develop the properties. In order to obtain expanded permits, it may be necessary to gather and analyze baseline data, complete environmental assessments or environmental impact statements with appropriate steps to mitigate potential adverse impacts, and modify the proposed plans in order to accommodate environmental impacts, all of which may take an indeterminate amount of time to complete.

10

The mining operations are regulated under the jurisdiction of the Mine Safety and Health Administration or "MSHA" to some degree to insure safe operations. Without proper training of personnel and compliance to all MSHA rules, the mine could be subject to heavy fines and closure. Unico strives to comply with MSHA regulations and maintain a good working relationship with MSHA. The mining operations are subject to periodic inspections by MSHA which, depending on the outcome of an inspection, could curtail production until any violations have been cured.

During approximately the last two years Unico has received some minor citations from MSHA and fines have been assessed. Unico is current on its payment obligations with respect to outstanding fines.

**Cost and Effect of Compliance with Environmental Laws**

Environmental regulations and guidelines have been established by state and federal agencies to insure that the environment is not permanently adversely impacted. Deer Trail Mining Company presently has $179,115 in reclamation bonds with the U.S. Forest Service and the Utah Division of Oil, Gas and Mining. As Unico expands its operations it will become necessary to comply with further regulations for larger operations and more bonding will be required from time to time. Permitting will be an ongoing function of Unico's operations.

**Compliance with the Sarbanes-Oxley Act of 2002**

On July 30, 2002, President Bush signed into law the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"). The Sarbanes-Oxley Act imposes a wide variety of new regulatory requirements on publicly held companies and their insiders. Many of these requirements will affect us. For example:

- Our chief executive officer and chief financial officer must now certify the accuracy of the financial statements contained in our periodic reports;
- Our periodic reports must disclose our conclusions about the effectiveness of our controls and procedures;
- Our periodic reports must disclose whether there were significant changes in our internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses; and
- We may not make any loan to any director or executive officer and we may not materially modify any existing loans.

The Sarbanes-Oxley Act has required us to review our current policies and procedures to determine whether we comply with the Sarbanes-Oxley Act and the new regulations promulgated thereunder. We will continue to monitor our compliance with all future regulations that are adopted under the Sarbanes-Oxley Act and will take actions necessary to ensure that we are in compliance therewith.

**Code of Ethics and Audit Committee Charter**

The Board of Directors of the Company adopted a Code of Ethics and an Audit Committee Charter.

The Code of Ethics applies to our principal executive officers, principle financial officer, principal accounting officer or controller, or persons performing similar functions. The code of ethics is designed to deter wrongdoing and to promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission ("SEC") and in other public communications made by the Company;
- Compliance with applicable governmental laws, rules and regulations;
- The prompt internal reporting of violations of the Code; and
- Accountability for adherence to the Code.

Unico's code of ethics was filed as an exhibit to Form 10-KSB for the year ended February 28, 2006.

The primary responsibility of the Audit Committee is to oversee the Company's financial reporting process on behalf of the Company's Board of Directors and report the result of their activities to the Board. Such responsibilities shall exclude but shall not be limited to, the selection, and if necessary the replacement of the Company's independent auditors, review and discuss with such independent auditors and the Company's internal audit department (i) the overall scope and plans for the audit, (ii) the adequacy and effectiveness of the accounting and financial controls, including the Company's system to monitor and manage business risks, and legal and ethical programs, and (iii) the results of the annual audit, including the financial statements to be included in the Company's annual report on Form 10-KSB. Unico's audit committee charter was incorporated by reference from the Company's Annual Report on Form 10-KSB for the Year Ended February 28, 2005 filed on June 20, 2005.

11

**ITEM 2.    DESCRIPTION OF PROPERTY**

**Deer Trail Lease**

On March 30, 1992, Deer Trail Mining Company, LLC entered into a Mining Lease and Option to Purchase agreement with Deer Trail Development Corporation, with headquarters in Dallas, Texas. Deer Trail Development Corporation is now known as Crown Mines, L.L.C. The lease was to run for a period of 10 years, and cover 28 patented claims, 5 patented mill sites and 171 unpatented claims located approximately 5 miles South of Marysvale, Utah. It includes mine workings known as the Deer Trail Mine, the PTH Tunnel and the Carisa and Lucky Boy mines.

Effective December 1, 2001, a new lease agreement was entered into between the parties covering the same property for a period of thirty (30) months. It was subsequently amended and extended through a series of amendments, with the most recent amendment, the Fourth Modification of Mining Lease and Option to Purchase being executed on April 26, 2007. It extended the lease term and option to purchase through May 31, 2007. Unico must pay an additional $1,700,000 by May 31, 2007 to exercise the option to purchase. A copy of this Amendment is attached to this Form 10-KSB as Exhibit 10.74.

Following the formation of the Deer Trail Mining Company in June 2004, Unico assigned all of the various assets, liabilities and operations associated with the Deer Trail Mine to Deer Trail Mining Company which has assumed responsibility for making payments under the Deer Trail Lease.

In August 2006, Deer Trail Mining Company entered into a Mining Lease with Joel Johnson covering the Clyde, Clyde Intermediate and Crown Point claims. These claims are located near the Deer Trail Mine. Deer Trail Mining Company has leased the claims for the purpose of conducting mine exploration, evaluation, and possible mining activities on the claims. The Mining Lease is for two years, with options to extend the lease for 50 additional one year periods. Under the terms of the Mining Lease, Deer Trail Mining Company paid initial down payments totaling $31,000 with $4,000 due in the second year of the lease. If Deer Trail Mining Company elects to extend the lease, it must pay $3,000 for the first extension year, and the annual lease extension payment increases ten percent (10%) per year thereafter. Additionally, Deer Trail Mining Company will pay three percent (3%) of the gross sale proceeds from the sale of any ore concentrates, or other mineral resources extracted from the claims.

In September 2006, Deer Trail Mining Company entered into a Non-Patented Mining Claims Lease covering approximately 70 additional claims covering approximately 1,500 acres in Piute County Utah for the purpose of exploration, evaluation and mining activities. In consideration for the rights under the agreement, the Deer Trail Mining Company agreed to pay the lease holders $7,000 per year for each of the first three years. Deer Trail Mining Company has the right to extend the lease for 50 additional one year periods. If extended by Deer Trail Mining Company, the annual lease payment is $10,000 in each of years four and five, and thereafter the annual lease payment increases by ten percent (10%) per year. In addition to the annual lease payments, Deer Trail Mining Company has also agreed to pay an amount equal to three percent (3%) of the gross sales proceeds from all ore, concentrates, and all other productions of mineral resources extracted from the claims. The agreement contains an option to purchase the claims exercisable at $350,000 during the first years of the lease. The exercise price increases $50,000 per year thereafter. It may only be exercised while the lease is effective.

The Deer Trail claims are located in the Tushar Mountains of East Central, Utah in the Mount Baldy and Ohio Mining districts.

They are located on Deer Trail Mountain, approximately 5 miles South of Marysvale, Utah and are accessible by a gravel county road which is in good condition. There are no known, proven or probable reserves on the property.

The Deer Trail ore body was first discovered by deer hunters in 1878. The ore body originally cropped out at the surface. It is estimated that between 1878 and 1917, about 10,000 tons of ore were mined. A small mill was installed in 1918, and between 1918 and 1923 the mine produced about 138,000 tons of predominately oxidized ore averaging 1.38 opt gold, 11.49 opt silver and 3.26% lead. Zinc and copper were not recovered. In 1923, mining was suspended when the workings encountered a fault that cut off the ore, and for more than 20 years production was limited to drawing stopes and removing pillars. In 1945, the PTH tunnel was started to explore for the faulted extension of the Deer Trail ore body. The 3,400 ore body was encountered unexpectedly by this tunnel and a total of 5,000 tons of ore averaging 2.84% lead, 0.76% copper, 6.26% zinc, 15.17 opt silver and 0.19 opt gold were shipped. By 1964, the PTH tunnel had intersected the offset part of the Deer Trail ore body. From 1964 until 1981 this segment of the ore body produced over 100,000 tons of unoxidized sulfide ore averaging 5% lead, 0.6% copper, 12% zinc, 15 opt silver, and 0.10 opt gold. The present working face is still in ore.

12

The PTH Tunnel penetrates more than 10,000 feet with a developed network of tunnels, shafts and raises at the 3,400 foot area and at the 8,000 foot area and was mined extensively for gold and silver for about 20 years. The timbered and ventilated tunnel includes more than two miles of track for ore cars accessed through a covered entrance structure.

The mine facilities also include ore cars, battery operated engines, an engine storage and charging house, an electric power substation, a miner's locker room, a compressor building, a 1,000 gallon underground gasoline storage tank with gas pump, two front end loaders, three dump trucks and a general office, two fully operational labs and a core sampling facility. Deer Trail Mining Company believes water is accessible to the site.

The Deer Trail mining property was developed by the Deer Trail Development Corporation, now known as Crown Mines, LLC, and is presently owned by the same company, located in Dallas, Texas. The property has been leased out several times since production ceased in 1981. There has been little production since then. Several major mining companies have explored the property. These include Noranda, Phelps Dodge and Goldfields. One smaller company drilled and analyzed the mill tailings from the upper Deer Trail Mine area in 1990. The results of the drilling and other tests were not conclusive, and at present there are no known proven or probable reserves on the claims.

Unico leased the property effective June 1, 1992. Unico has produced a few small lots of ore from the stopes in the 8600 area of the PTH tunnel for testing and evaluation purposes, and has developed several excellent targets within those workings. In April 2001, Unico began limited mining operations which were concentrated in the 3400 area of the mine until underground mining operations temporarily stopped in October 2003. Unico transferred all rights and obligations to the Deer Trail Mining Company in June 2004. Deer Trail Mining Company is the current operator of the Deer Trail Mine and has been since it resumed operations. Deer Trail Mining Company resumed underground mining operations at the Deer Trail Mine in late 2004. Underground mine operations have been suspended until further infrastructure improvements are completed, and the results of the underground drill program have been fully evaluated.

**Deer Trail Mine Geological Information**

The Deer Trail mine workings expose westerly dipping sedimentary rocks of three units: the Toroweap and Queantoweap Formations and the Callville Limestone. The Deer Trail ore body is in the lower part of the Toroweap Formation and consists of a nearly continuous group of semiconcordant replacement bodies flanking a central vein. About half of this ore body is exposed in the Old Deer Trail mine workings and is oxidized; the other half is located in the 8600 area workings and consists of unoxidized sulphide ore. The Queantoweap Formation, which underlies the Toroweap, is a quartzite and hosts no known mantos. The underlying Callville Limestone contained the 3400 ore body.

The Toroweap Formation exposed in the 8600 area consists of a wide range of interbedded lithologies, including quartzite, limestone, dolomite, shale, and chert, which form 50 or more recognizable units ranging in thickness from a inch to several feet. In contrast, the underlying Queantoweap Sandstone consists of a fairly uniform medium-grained, well-sorted massive quartzite.

The Calville Limestone in the Deer Trail mine lacks marker beds, and lithologic facies change rapidly. The rocks are cut by several faults of unknown displacement. The marked lateral variations in lithology have made it possible to identify only seven correatable stratigraphic assemblages. The upper 240 feet of the Callville Limestone in the 3400 area consists dominantly of mudstones containing quartz silt, evaporite nodules, and sponge spicules. Below 240 feet, dolomite containing microfossils and peloids is abundant and evaporites are absent. In the 8600 area, the Callville has been observed in drill core and there it contains thick beds of course-grained anhydrite.

The Toroweap Formation in the mine area strikes generally north-south and dips 201 W. The Deer Trail ore body rakes across this inclination with a bearing of N 701 W, so the average plunge of the ore zone into Deer Trail Mountain is about 181.

13

The mantos in the Old Deer Trail mine workings closely followed the axis of the Deer Trail anticline, a relationship that was used to guide development. In the 8600 area, however, the mantos and the anticline axis diverge and the deepest workings are about 1500 feet apart.

The Deer Trail ore body consists of a semicontinuous group of narrow, elongate strata-bound replacement bodies developed adjacent to a central vein. The ore body has a sinuous ribbon like shape in plain view and has been mined for a length of approximately 5,525 feet over a width averaging 32 to 38 feet and a height averaging about 15 to 30 feet.

A set of cross faults that trends east-northeast and dip steeply to the north are exposed in the mine workings in the 8600 area. These have an aggregate stratigraphic throw of about 150 feet, down to the north. One of these faults is the 18 Drift fault or 18 North fault. These faults are now occupied by quartz veins as much as 15 feet thick that contain substantial quantities of lead, zinc, arsenic, silver, gold, copper and molybdennum. The 18 north fault consists of quartz with good values in gold, silver and copper with very little other metals which could possibly be marketed to smelters as a flux.

### Deer Trail Mine Workings

The mine workings at the Deer Trail consist of the upper Old Deer Trail mine workings and the PTH tunnel mine workings. The Old Deer Trail mine consists of three levels, approximately 100 vertical feet apart. The first level was first accessed from the surface through the discovery shaft of 1878, with several adits interconnecting from the surface. The second level or the No. 2 Tunnel level is accessed through one known tunnel and consists of several large stopes interconnected with a series of drifts, winzes, and raises. The third level or the No. 3 Tunnel level was used as a haulage tunnel and was the main level of the Old Deer Trail mine. It consists of drifts and raises all accessed by 18" narrow gauge track. The present workings are only partially accessible. Many drifts have caved. All three levels are interconnected allowing for good ventilation.

The PTH Tunnel workings underlie the Old Deer Trail workings by approximately 450 feet and accessed 4,000 feet to the south. The PTH Tunnel was started in 1945 to intersect the faulted Deer Trail ore body. It is a 5'x7' tunnel that extends over 10,000 feet into Deer Trail Mountain. Almost all areas of these workings are accessed by 18" narrow gauge track. The tunnel trends to the north-northwest paralleling the base of Deer Trail Mountain. At approximately 3,400 feet the tunnel intersected unexpectedly mineralization in the Callville Limestone. This mineralization was developed on the PTH Tunnel level as well as two levels below 100 vertical feet apart. Bedded mineralization associated with the Wet Fault was produced via a series of drifts, winzes, stopes and raises. A ventilation/escape shaft was driven to the surface in this area. The tunnel next encountered mineralization at approximately 8,600 feet, where the tunnel encountered the continuation of the Deer Trail ore body. Several thousand feet of drifts was driven to explore and exploit the deposit. An internal shaft was driven 250 feet to gain access to the shallowing dipping ore where three more levels were established. Again several hundred feet of drifts, stopes, raises and winzes were driven to mine the ore body.

Water was encountered in the 280 winze and pumps were installed in order to continue mining. Mining was stopped in 1981 due to lack of processing and smelting facilities. The present face in the 280 area is still in ore. The width of the face was increasing as well as the value of the ore. A raise to connect the PTH workings with the Old Deer Trail Mine was started located approximately where the PTH Tunnel crossed the 18 North fault. It is presently up 140 feet.

### Deer Trail Mine Mineral Resources

The potential resources have been outlined above. However, further efforts to increase the mineable resources of the mine are being explored. Deer Trail Mining Company completed phase one which included a reverse circulation exploratory drill program in the upper Deer Trail Mine area. Deer Trail Mining Company also completed a second phase of underground diamond core drilling conducted in the PTH Tunnel of the Deer Trail Mine, which began in first quarter of 2005 to attempt to prove up reserves. Deer Trail Mining Company is also evaluating ways to mine more efficiently in order to mine lower grade ores economically. Deer Trail Mining Company is evaluating whether cyanide may be used in processing its ore. Deer Trail Mining Company acquired two heavy media separators. The heavy media separator is a method whereby low grade material can be upgraded underground. Areas left undeveloped in the mine due to the amount of waste rock between narrow mineralized beddings might effectively be produced by using heavy media separator technology.

The Deer Trail deposit is similar to many deposits in Utah, such as Tintic and Park City, where mine reserves were drilled approximately two years ahead of production due to the nature of the deposits and the costs involved in drilling out entire reserves before mining began. It is planned that reserves in the Deer Trail will be established two to three years ahead of production. Exploration drilling will be conducted in conjunction with mine production. Several prospective targets will be drilled from underground as the workings advance.

14

To date only two known mineralized horizons have been exploited. Deer Trail Mining Company believes the underlying formations contain very favorable horizons for mineralization, but they have yet to be tested. Deer Trail Mining Company believes the potential is excellent that more mineralization will be discovered.

## Deer Trail Mining Company's Purchase of 680 Acres Near the Deer Trail Mine

On August 28, 2000, Unico purchased approximately 680 acres of raw ground located in Piute County, State of Utah for $200,000. This land is adjacent to the existing Deer Trail Mine property leased by Unico which is currently operated by the Deer Trail Mining Company. The property was purchased from Tech-Sym Corporation of Houston, Texas.

Deer Trail Mining Company purchased the property for the purpose of establishing a mill site on the property and to use as a place to store waste rock from mining operations, and for other general mining and business purposes.

In June 2002, this property was encumbered by a trust deed securing a loan in the amount of $200,000 which was used to finance general operations of Deer Trail Mining Company. On June 25, 2004, the balance and accrued interest related to this debt was repaid through the issuance of common stock.

## Silver Bell Mine

On December 6, 2000, Unico acquired all of the issued and outstanding shares of stock of Silver Bell Mining Company, Incorporated, a Utah corporation, in consideration for the issuance of 3,000,000 restricted shares of Unico common stock. In June 2002, all of the Silver Bell Mining claims were encumbered by a trust deed securing a loan in the amount of $350,000 which was used to finance general operations of Silver Bell Mining Company, Incorporated. On June 25, 2004, the balance and accrued interest related to this debt was repaid through the issuance of common stock.

Silver Bell Mining Company, Incorporated was incorporated in the State of Utah on April 26, 1993. It has acquired 26 patented mining claims located in American Fork Canyon, Utah County, Utah, which is organized into three separate parcels. The claims contain mining properties which have not been mined for production since 1983. The properties were mined primarily for silver, lead and zinc. There are no known, proven or probable reserves on the property.

The Silver Bell deposit was first discovered in 1871 by soldiers stationed at Fort Douglas in Salt Lake City. Mining was confined to select high grade ores averaging 100 ounces per ton in silver. The workings consisted of an adit and a winze and ore was lowered down the mountain by means of a cable and rail system. The mine was enlarged to accommodate larger equipment in 1980 and some ore was produced which averaged 22 ounces in silver per ton of ore. The deposit consists of a single fissure or vein known as the Silver Bell fissure which averages six feet in width and dips to the NW at 62 degrees. It has been exposed for over 300 feet in depth and over 1,200 feet of strike length. Associated with the fissure several mineralized horizons (mantos) have been encountered. Recent independent sampling done by Watts, Grifiths, and McQuat and others demonstrate that the mantos are far richer than the vein mineralization with values as high as 120 ounces per ton silver. The deposit contains both oxide and sulphide ore rich in silver, lead, zinc and copper. The sulphide mineralization contains more values than the oxides. The mineralized system is located within the Maxfield cambrian limestone unit and extends down through the Ophir units into the Tintic Quartzite. There is presently an estimated resources of over 100,000 tons.

Silver Bell Mining Company conducted some exploration work on the Silver Bell Mine in Summer, 2003 through 2004. Silver Bell Mining Company plans to commence an exploration and resource definition program at the Silver Bell Mine during Summer, 2007. Silver Bell Mining Company may also seek a joint venture mining partner to jointly develop the Silver Bell Mine. Silver Bell Mining Company anticipates that any ore mined from the Silver Bell Mine will be transported to the Deer Trail Mine site where it will be crushed and milled.

In August 2006, Silver Bell Mining Company reached a preliminary agreement for a joint venture with the Polymet Company, LLC for mining at the Silver Bell Mine and executed a letter of intent. Currently, Silver Bell Mining Company and Polymet Company, LLC are negotiating terms on their joint venture, but have not signed a definitive agreement.

## Bromide Basin Mines

On July 20, 2001, Bromide Basin Mining Company, LLC entered into a Mining Lease and Option to Purchase with Kaibab Industries, Inc., an Arizona corporation. The parties then entered into a Revised Mining Lease and Option to Purchase in April 2003 (the "Revised Kaibab Mining Lease") and a Second Revised Mining Lease and Option to Purchase in May 2005 which expired November 1, 2005. Effective May 1, 2006, the parties entered into a Third Revised Mining Lease and Option to Purchase (the "Third Revised Mining Lease"). At that time Unico paid approximately $63,591.62 to Kaibab Indutries, Inc. for past due lease payments, taxes and BLM fees. Under the Third Revised Mining Lease, Kaibab Industries, Inc. has leased to Bromide Basin Mining Company certain mining claims located in the Henry Mountain Mining District in Garfield County, Utah containing approximately 400 acres, which includes the Bromide Basin Mines. The Third Revised Mining Lease grants to Bromide Basin Mining Company the option to purchase six (6) fully permitted patented mining claims and twenty-one (21) located mining claims comprising in all over 400 acres of Bromide Basin in the Henry Mountain Mining District located in Garfield County, Utah. The option exercise price is $835,000 for all specified mining claims, mill sites and dumps being leased. It expires November 1, 2006, but Bromide Basin Mining Company has the right to extend the lease for one additional year. As consideration for the Second Revised Mining Lease, Bromide Basin Mining Company has agreed to pay Kaibab Industries in advance the sum of $5,000 per month and pay a five percent (5%) net smelter return upon all ore taken from the leased premises each month, to the extent that the amount for any month exceeds the $5,000 monthly base rent. Prior to the Third Revised Mining Lease expiration date of November 1, 2006, Bromide Basin Mining Company formally requested to extend the lease for one additional year. Kaibab Industries accepted the request, and extended the Lease and Option for one year, from November 1, 2006 through October 31, 2007.

15

The primary purpose of this agreement is to allow Bromide Basin Mining Company access to the claims to conduct an extensive preproduction feasibility study prior to any additional mining production and to analyze the potential of the claims before exercising its purchase option from Kaibab Industries.

## Purchase of Mining Equipment

In April 2003, Unico purchased certain mining equipment from Kaibab Industries, Inc. for $165,000. To pay for the equipment, Unico executed a promissory note which Unico and Bromide Mining Company, LLC have collectively assumed liability to make payments of $2,000 per month, this promissory note was extended until July 1, 2005. The promissory note was paid in full in April 2006 when Unico paid approximately $125,785 to Kaibab Industries, Inc.

## Principal Offices

Our principal offices are located at 8880 Rio San Diego Drive, 8 [th] Floor, San Diego, California 92108. We lease on a month-to-month basis at a rate of $2,160 per month. We believe our office space is suitable for our needs for the foreseeable future.

### ITEM 3.      LEGAL PROCEEDINGS

During the quarter ended May 31, 2005, the Company was notified by a staff attorney at the Securities and Exchange Commission ("Commission") that certain debentures and convertible preferred stock issued by the Company were considered

"senior securities" as defined by the Investment Company Act of 1940 ("Investment Act"). Unico believed at the time that the debentures and Series A Preferred shares that were issued were not senior securities. The Company may not have been in compliance with Section 18 of the Investment Act which required that the Company maintain net asset to senior security coverage of at least 200% while the Company was a business development company ("BDC"). The Company's efforts to restructure the obligations and preferred stock into a format acceptable with the Commission were unsuccessful. As a result, the Company may have been out of compliance with Sections 18, 27 and 61 of the Investment Act while the Company was a BDC. On October 11, 2005, the Company's shareholders approved a proposal to authorize the Company's Board of Directors to withdraw the Company's election to be treated as a BDC. On October 12, 2005 the Company filed a Notification of Withdrawal of Election to be Subject to Sections 55 through 65 of the Investment Company Act of 1940 pursuant to Section 54 (c) of the Act with the Commission in order to withdraw the Company's election to be treated as a BDC.

During the year ended February 28, 2007, the Company entered into a total of 108 settlement transactions in the Twelfth Circuit (State) Court in Florida stemming from defaulted convertible debentures totaling $2,740,000. Unico agreed to settle all of the action by issuing a total of 986,744,018 shares of its common stock to the plaintiffs. These shares were issued pursuant to Section 3(a)(10) of the Securities Act of 1933, as amended, after a hearing with notice to, and an opportunity to be heard from, interested parties, as to the fairness of each transaction, by a state court in Florida which specifically determined, prior to declaring that the transactions were exempt under Section 3(a)(10), that the transactions were fair to the interested parties.

**ITEM 4.**        **SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

None.

16

PART II

ITEM 5.    MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

**Market Information**

The Company's common stock is traded on the OTCBB (Over-The-Counter Bulletin Board) under the symbol "UCOI". The following table sets forth the trading history of the common stock on the Bulletin Board for each quarter during the last two fiscal years ended February 28, 2007, as reported by Dow Jones Interactive and/or Pink Sheets, LLC. The quotations reflect inter-dealer prices, without retail mark-up, markdown or commission and may not represent actual transactions. The quotations have been adjusted to reflect the Company's 1 for 100 reverse stock split that occurred August 11, 2006 as though the reverse stock split had occurred March 1, 2005.

| Quarter Ending | | Quarterly High | | Quarterly Low |
|---|---|---|---|---|
| 5/31/2005 | $ | .50 | $ | .40 |
| 8/31/2005 | $ | .40 | $ | .40 |
| 11/30/2005 | $ | .60 | $ | .50 |
| 2/28/2006 | $ | .50 | $ | .40 |
| 5/31/2006 | $ | .45 | $ | .08 |
| 8/31/2006 | $ | .13 | $ | .046 |
| 11/30/2006 | $ | .057 | $ | .0056 |
| 2/28/2007 | $ | .017 | $ | .0055 |

**Holders of Record**

As of February 28, 2007 there were approximately 612 holders of record of the Company's common stock. The Company believes it has many additional shareholders who hold shares through brokerage accounts and/or in street name.

**Dividends**

We have not paid any dividends during the last two fiscal years ended February 28, 2007 or since then. We currently intend to retain any earnings to finance the development and expansion of our operations and do not anticipate paying cash dividends or making any other distributions on our shares of common stock in the foreseeable future. Our future dividend policy will be determined by our board of directors on the basis of various factors, including our results of operations, financial condition, business opportunities and capital requirements.

Under Arizona state corporate law, no dividends may be paid if, after giving effect to the dividends, either: (a) Unico would not be able to pay its debts as they become due in the usual course of business; or (b) Unico's total assets would be less than the sum of its total liabilities plus, unless Unico's articles of incorporation provide otherwise, the amount that would be needed, if Unico were to be dissolved at the time of the distribution, to satisfy the preferential rights on dissolution of shareholders whose preferential rights are superior to those receiving the dividend.

**Recent Sales of Unregistered Securities**

From March 1, 2006 through February 28, 2007 Unico issued convertible debentures ("Debentures") aggregating approximately $700,000 to Reef Holding, Ltd., approximately $622,500 to Kentan Limited Corp., approximately $132,500 to Compass Capital, approximately $100,000 to Umbrella Holdins, approximately $2,225,000 to Outboard Holdings and approximately $200,000 to Blue Marble that were unpaid. All of the debentures except the Blue Marble debenture are in default. These debentures along with other debentures issued before March 1, 2006 were assigned to Blue Marble Investments, Outboard Investments, Umbrella Holdings and Yanzu, Inc. Because Unico, Incorporated failed to pay the Debentures when due, a total of approximately 108 lawsuits were filed by these Debenture holders against Unico, Incorporated in the Twelfth Circuit (State) Court in Florida during the fiscal year ended February 28, 2007.

The Debentures provided that the principal amount and accrued interest were convertible, at the option of the holders of the Debentures, into Unico's common stock at a price per share equal to 50% of the closing bid price of Unico's common stock as quoted on the OTC Bulletin Board on the immediately preceding trading day prior to the notice of conversion.

17

Unico agreed to settle each action by issuing shares of its common stock to the plaintiffs using a valuation of approximately 14% to 20% of the then existing bid price of Unico, Incorporated common stock. These shares were issued pursuant to Section 3(a)(10) of the Securities Act of 1933, as amended, after a hearing with notice to, and an opportunity to be heard from, interested parties, as to the fairness of each transaction, by a state court in Florida which specifically determined, prior to declaring that the transactions were exempt under Section 3(a)(10), that the transactions were fair to the interested parties.

From March 1, 2006 until February 28, 2007, in connection with the exercise of conversion rights by the holders of the Debentures and pursuant to the litigation settlements, Unico issued an aggregate of 986,744,018 shares of its common stock.

There were no underwriters involved in any of the stock issuances described above, and there were no underwriting discounts or commissions paid. The stock in each transaction was issued pursuant to Section 3(a)(10) of the Securities Act of 1933 as "securities issued in exchange for one or more bona vide outstanding securities, claims or property interests . . . where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions . . . ."

During the fiscal year ended February 28, 2007, the Company issued a total of 7,900,000 shares of its common stock to Ray C. Brown and 1,953,165 shares of its common stock to Wayne Hartle pursuant to convertible debentures in consideration of the conversion of $100,527 in accrued interest and $74,073 in principal by Ray C. Brown and $6,859 in accrued interest and $30,642 in principal by C. Wayne Hartle. These shares were issued without registration in reliance on Section 4(2) of the Securities Act of 1933 for transactions not involving any public offering, and the certificates representing the shares were appropriately restricted.

During the Fiscal year ended February 28, 2007 the Company entered into two stock purchase agreements with Cherry Creek Holdings, LLC where in Cherry Creek purchased 33,333,333 and 42,785,700 shares of unregistered and restricted shares of Common stock for $400,000 and $599,000 respectively. The shares have not been issued and are reported as a stock payable on the financial statements. The cash has been received and the stock will be issued in the fiscal year ending February 28, 2008. The signed agreements are listed as exhibits 10.76 and 10.77 respectively. These shares will be issued without registration in reliance on Section 4(2) of the Securities Act of 1933 for transactions not involving any public offering, and the certificates representing the shares will be appropriately restricted.

For information concerning sales of shares of Unico's Common Stock by Unico which were not registered under the Securities Act of 1933 during the fiscal years ended February 28, 2005 and February 28, 2006 please refer to Unico's annual reports on Form 10-KSB for the fiscal years ended February 28, 2005 and February 28, 2006, respectively, and to Unico's quarterly reports on Form 10-QSB for the quarters ended May 31, 2004 and 2005, August 31, 2004 and 2005 and November 30, 2004 and 2005.

**ITEM 6.        MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION**

The following information should be read in conjunction with the consolidated financial statements and notes thereto appearing elsewhere in this Form 10-KSB.

**Plan of Operation**

During the next 12 months, the Company's plan of operation is to raise approximately $5,000,000 for investment into its subsidiary companies: Deer Trail Mining Company, Bromide Basin Mining Company and Silver Bell Mining Company. The funds are intended for the following purposes:

- Complete logging and shipment of core samples identified and taken from the completed 2nd phase of exploratory drilling at the Deer Trail Mine and have them analyzed/certified by an independent lab and consulting firm;
- Continue sampling and analyzing ore from the Deer Trail Mine to evaluate the most efficient means to conduct future mining and milling activities;
- Increase mining activities and upgrade mine infrastructure at the Deer Trail Mine;
- Continue to upgrade and complete the re-construction project on the existing mill at the Deer Trail Mine;
- Upgrade the crushing facility at the upper Deer Trail Mine and continue processing the ore dumps;
- Begin milling and processing activities at the Deer Trail Mine mill facility;
- Acquire new mining equipment to improve operations at the Deer Trail Mine;
- Upgrade and complete modifications to the electrical substation at the Deer Trail Mine;

- Conduct an extensive preproduction feasibility study at the Bromide Basin Mine prior to any additional mining production and analyze the potential of the claims before exercising its purchase option from Kaibab Industries;
- Exercise the purchase option on the Bromide Basin Mine lease;
- Conduct additional survey and mapping work on the Clyde and Crown Point mining claims including improvements to the property and potentially underground and surface exploratory drilling on the claims;
- Commence an exploration and resource definition program at the Silver Bell Mine beginning in 2007; and
- Exercise or extend an option to purchase the Deer Trail Mine for $3,000,000.

18

Accomplishing the 12-month plan of operations is dependent on the Company raising approximately $5,000,000 in equity and/or debt financing during the next 12 months. Subsequent to the fiscal year ending February 28, 2007, the Company received $2,840,000 through the issuance of new convertible debentures. The new debentures were issued with terms of 180 days, bear interest at the rate of 8% per annum, and are convertible by the holder into shares of the Company's common stock at a discount of 50% of the closing bid price on the date of conversion. The Company intends to raise approximately an additional $2,000,000 to $3,000,000 during the fiscal year ending February 28, 2008 to fulfill the 12-month plan.

**Liquidity and Capital Resources**

The Company's financial statements present an impairment in terms of liquidity. As of February 28, 2007 the Company had $7,194 in current assets and the Company's total liabilities exceeded total assets by approximately $2,756,709. The Company has accumulated $44,884,761 of net operating losses through February 28, 2007, which may used to reduce taxes in future years through 2027. The use of these losses to reduce future income taxes will depend on the generation of sufficient taxable income prior to the expiration of the net operating loss carry-forwards. The potential tax benefit of the net operating loss carry-forwards have been offset by a valuation allowance of the same amount. Under continuing operations the Company has not yet established revenues to cover its operating costs. Management believes that the Company will soon be able to generate revenues sufficient to cover its operating costs. In the event the Company is unable to do so, and if suitable financing is unavailable, there is substantial doubt about the Company's ability to continue as a going concern.

The Company's stockholders' deficit decreased $2,649,500 in the year ended February 28, 2007, from a deficit of ($5,406,209) as of February 28, 2006 to a deficit of ($2,756,709) as of February 28, 2007. Although the retained earnings deficit increased substantially due to the derivative cost of financing Deer Trail operations, it was more than offset by the increase in additional paid in capital.

The Company's cash as of February 28, 2007 will sustain operations for approximately 120 days. As explained above the Company has raised $2,840,000 through the issuance of convertible debentures since February 28, 2007. The Company intends to raise an additional $2,000,000 to $3,000,000 during the current fiscal year.

**Results of Operations**

For the year ended February 28, 2007, Unico reported no revenue compared to $26,202 for the fiscal year ended February 28, 2006. The prior year revenues were generated from the sale of concentrates.

For the year ended February 28, 2007 the Company had a net loss of $18,333,266, or approximately ($0.071) per share, attributable mostly to loss on settlement of debt and interest expense associated with derivative expenses from financing of operations. For the year ended February 28, 2006 Unico reported a loss of $2,272,097. The increased loss was due to an increase in operational expenses of $360,000 and $15,640,000 of interest and debt settlement costs associated with derivative expense financing.

**Defaults Upon Senior Securities.**

From March 1, 2006 through August 31, 2006 Unico issued convertible debentures ("Debentures") aggregating approximately $700,000 to Reef Holding, Ltd., approximately $622,500 to Kentan Limited Corp., approximately $132,500 to Compass, $100,000 to Umbrella Holdings, approximately $2,225,000 to Outboard Holdings that were unpaid, and in default, as of February 28, 2007. The holders of the convertible debentures had assigned portions of the Debentures to Blue Marble Investments, Outboard Investments, Umbrella Holdings and Yanzu, Inc. Because Unico, Incorporated failed to pay the Debentures when due, a total of ten (108) lawsuits were filed by these Debenture holders against Unico, Incorporated in the Twelfth Circuit (State) Court in Florida  The Debentures provided that the principal amount and accrued interest were convertible, at the option of the holders of the Debentures, into Unico's common stock at a price per share equal to 50% of the closing bid price of Unico's common stock as quoted on the OTC Bulletin Board on the immediately preceding trading day prior to the notice of conversion. Unico agreed to settle each action by issuing shares of its common stock to the plaintiffs using a valuation of approximately 14% to 20% of the then existing bid price of Unico, Incorporated common stock. These shares were issued pursuant to Section 3(a)(10) of the Securities Act of 1933, as amended, after a hearing with notice to, and an opportunity to be heard from, interested parties, as to the fairness of each transaction, by a state court in Florida which specifically determined, prior to declaring that the transactions were exempt under Section 3(a)(10), that the transactions were fair to the interested parties. From March 1, 2006 until February 28, 2007, in connection with the exercise of conversion rights by the holders of the Debentures and pursuant to the litigation settlements, Unico issued an aggregate of 986,744,018 post-reverse split shares of its common stock. As of February 28, 2007, Unico has approximately $1,886,059 in outstanding debentures that were in default.

19

**RISK FACTORS**

We are subject to various risks that may materially harm our business, financial condition and results of operations. You should carefully consider the risks and uncertainties described below and the other information in this filing before deciding to purchase our common stock. If any of these risks or uncertainties actually occurs, our business, financial condition or operating results could be materially harmed. In that case, the trading price of our common stock could decline and you could lose all or part of your investment.

**We Will Need to Raise Additional Capital to Finance Operations**

Past operations have relied on monies generated from external financing to fund our operations. However, we anticipate that we will generate profits in the coming year so that we will not need to rely entirely on external financing to raise additional capital to fund our anticipated operating expenses and future expansion. External financing will be required for future expansion, however. We cannot assure you that financing whether from external sources or related parties will be available if needed or on favorable terms. The sale of our common stock to raise capital may cause dilution to our existing shareholders. Our inability to obtain adequate financing may result in the need to curtail business operations. Any of these events would be materially harmful to our business and may result in a lower stock price.

**There is Substantial Doubt About Our Ability to Continue as a Going Concern Due to Recurring Losses and Working Capital Shortages, Which Means that We May Not Be Able to Continue Operations Unless We Obtain Additional Funding**

The report of our independent accountants on our February 28, 2007 financial statements included an explanatory paragraph indicating that there is substantial doubt about our ability to continue as a going concern due to recurring losses and working capital shortages. Our ability to continue as a going concern will be determined by our ability to obtain additional funding. Our financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**We are not likely to succeed unless we can overcome the many obstacles we face.**

As an investor, you should be aware of the difficulties, delays and expenses we encounter, many of which are beyond our control, including unanticipated market trends, employment costs, and administrative expenses. We cannot assure our investors that our proposed business plans as described in this report will materialize or prove successful, or that we will ever be able to finalize development of our products or services or operate profitably. If we cannot operate profitably, you could lose your entire investment. As a result of the nature of our business, initially we expect to sustain substantial operating expenses without generating significant revenues.

**We Could Fail to Retain or Attract Key Personnel**

Our future success depends, in significant part, on the continued services of Mark A. Lopez our Chief Executive. We cannot assure you that we would be able to find an appropriate replacement for key personnel. Any loss or interruption of our key personnel's services could adversely affect our ability to develop our business plan. We have no employment agreements or life insurance on Mr. Lopez.

**Our Officers and Directors Have the Ability to Exercise Significant Influence Over Matters Submitted for Stockholder Approval and Their Interests May Differ From Other Stockholders**

Our executive officers and directors have the opportunity, whether acting alone or together, to have significant influence in determining the outcome of any corporate transaction or other matter submitted to our Board for approval, including appointing officers, which could have a material impact on mergers, acquisitions, consolidations and the sale of all or substantially all of our assets. The interests of these board members may differ from the interests of the other stockholders.

20

**Our Common Stock May Be Affected By Limited Trading Volume and May Fluctuate Significantly**

There has been a limited public market for our common stock and there can be no assurance that an active trading market for our common stock will develop. As a result, this could adversely affect our shareholders' ability to sell our common stock in short time periods, or possibly at all. Our common stock has experienced, and is likely to experience in the future, significant price and volume fluctuations that could adversely affect the market price of our common stock without regard to our operating performance. In addition, we believe that factors such as quarterly fluctuations in our financial results and changes in the overall economy or the condition of the financial markets could cause the price of our common stock to fluctuate substantially. Substantial fluctuations in our stock price could significantly reduce the price of our stock.

**Our Common Stock is Traded on the "Over-the-Counter Bulletin Board," Which May Make it More Difficult For Investors to Resell Their Shares Due to Suitability Requirements**

Our common stock is currently traded on the Over the Counter Bulletin Board (OTCBB) where we expect it to remain for the foreseeable future. Broker-dealers often decline to trade in OTCBB stocks given that the market for such securities is often limited, the stocks are more volatile, and the risk to investors are greater. These factors may reduce the potential market for our common stock by reducing the number of potential investors. This may make it more difficult for investors in our common stock to sell shares to third parties or to otherwise dispose of them. This could cause our stock price to decline.

**Our common stock is subject to the "penny stock" rules of the SEC and the trading market in our securities is limited, which makes transactions in our stock cumbersome and may reduce the value of an investment in our stock.**

The Securities and Exchange Commission has adopted Rule 15g-9 which establishes the definition of a "penny stock," for the purposes relevant to us, as any equity security that has a market price of less than $5.00 per share or with an exercise price of less than $5.00 per share, subject to certain exceptions. Inasmuch as that the current bid and ask price of common stock is less than $5.00 per share, our shares are classified as "penny stock" under the rules of the SEC. For any transaction involving a penny stock, unless exempt, the rules require:

- That a broker or dealer approve a person's account for transactions in penny stocks; and

- The broker or dealer receives from the investor a written agreement to the transaction, setting forth the identity and quantity of the penny stock to be purchased.

  In order to approve a person's account for transactions in penny stocks, the broker or dealer must:

- Obtain financial information and investment experience objectives of the person; and

- Make a reasonable determination that the transactions in penny stocks are suitable for that person and the person has sufficient knowledge and experience in financial matters to be capable of evaluating the risks of transactions in penny stocks.

The broker or dealer must also deliver, prior to any transaction in a penny stock, a disclosure schedule prescribed by the Commission relating to the penny stock market, which, in highlight form:

- Sets forth the basis on which the broker or dealer made the suitability determination; and

- That the broker or dealer received a signed, written agreement from the investor prior to the transaction.

  Generally, brokers may be less willing to execute transactions in securities subject to the "penny stock" rules. This

may make it more difficult for investors to dispose of our common stock and cause a decline in the market value of our stock.

Disclosure also has to be made about the risks of investing in penny stocks in both public offerings and in secondary trading and about the commissions payable to both the broker-dealer and the registered representative, current quotations for the securities and the rights and remedies available to an investor in cases of fraud in penny stock transactions. Finally, monthly statements have to be sent disclosing recent price information for the penny stock held in the account and information on the limited market in penny stocks.

21

**ITEM 7.**      **FINANCIAL STATEMENTS**

See the financial statements annexed to this report.

**ITEM 8.**      **CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

During our two most recent fiscal years ended February 28, 2007, or any later interim period, Unico has not had a principal independent accountant or an independent accountant on whom the principal independent accountant expressed reliance in its report, resign, decline to stand for re-election, or be dismissed.

**ITEM 8A.**      **CONTROLS AND PROCEDURES**

Under the supervision and with the participation of management, acting as our principal executive officer and principal financial officer, Mark A. Lopez evaluated the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 ("Exchange Act"), as of February 28, 2007. Based on this evaluation, our principal executive officer and our principal financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective and adequately designed to ensure that the information required to be disclosed by us in the reports we submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the applicable rules and forms and that such information was accumulated and communication to our chief executive officer and chief financial officer, in a manner that allowed for timely decisions regarding required disclosure.

During the last fiscal quarter ended February 28, 2007, there has been no change in internal control over financial reporting that has materially affected, or is reasonably likely to materially affect our internal control over financial reporting.

**ITEM 8B.**      **OTHER INFORMATION**

Not applicable.

**PART III**

**ITEM 9.**      **DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS; COMPLIANCE WITH SECTION 16(a) OF THE EXCHANGE ACT**

The executive officers and directors of the Company as of June 11, 2007 are as follows:

| Name | Age | Position |
|---|---|---|
| Mark A. Lopez | 43 | CEO |
| Wayne M. Ash | 67 | President |
| Kenneth Wiedrich | 61 | Chief Financial Officer |
| Wayne Hartle | 70 | Secretary and Director |
| Kiyoshi Kasai | 90 | Director |
| Ray C. Brown | 84 | Chairman of the Board of Directors |

The business experience of each of the persons listed above is as follows:

Mark A. Lopez has served as chief executive officer of Unico, Incorporated and as a co-manager of two of Unico's subsidiaries, Deer Trail Mining Company, LLC and Bromide Basin Mining Company, LLC, since September 7, 2004. He served as a consultant to Unico from September 2003 until September 2004 when he became CEO. Mr. Lopez has served as a vice president of investments for Ashton Capital Management, Inc., a securities broker dealer, from December 2001. He has been licensed as a registered investment advisor since November, 2001. Mr. Lopez served as a general securities principal for American Pacific Securities, Inc. (formerly known as Sy Leavitt Company, Inc.) from June 1996 through December 2001. He served as a co-manager of KM Income Properties LLC, a real estate investment company, from June 1998 through May 2000. He served as a registered investment advisor with Centurion Capital Management, LLC from October 1998 until February 2001. He also served as a licensed life and disability insurance agent with Alliance Financial Investment Services, Inc. from June 1994 until May 2000.

22

Wayne M. Ash has served as president of Unico since February 2003. From 1986 to the present, Mr. Ash has served as president of Ash & Associates Consulting Ltd. Mr. Ash has evaluated over 100 mineral prospects and potential mining properties in Canada, the United States, Latin America and Asia. Mr. Ash has more than forty years experience in the mining industry.

Kenneth Wiedrich has served as the chief financial officer of Unico since April 2007. Mr. Wiedrich has over 33 years of experience in operational accounting and finance functions in a variety of businesses within the service, construction and manufacturing industries. Mr. Wiedrich has experience in the use of several automated accounting systems including MAS90, Peachtree, and QuickBooks. Mr. Wiedrich has experience with governmental cost accounting methods and related government acquisition regulations. In his capacity as the Chief Financial Officer for RI-Tech, Inc. (1990-2003), he was responsible for the day–to–day administrative functions of the company as well as all accounting and financial aspects of the business. Mr. Wiedrich was involved in raising money through private placement and long-term financing for Ri-Tech. From 2003 to 2007, Mr. Wiedrich served as Controller for Javelin Advisory Group, Inc.

Wayne Hartle has served as the secretary and as a director of Unico since 1990. Mr. Hartle resigned as a director in July, 2004 and was re-elected as a director in May 2007. Mr. Hartle owns and operates Wayne's Service Center, an automobile repair and service business in Salt Lake City, Utah. Mr. Hartle is the former chief financial officer of Energy and Corrosion Research Company from 1979 to 1981. Mr. Hartle received a degree from Henagers Business College in Salt Lake City, Utah.

Ray C. Brown served as the chief executive officer and director of Unico since 1983, on September 7, 2004 he voluntarily resigned as chief executive officer and Mark Lopez was appointed chief executive officer. Mr. Brown continues to serve as chairman of the board of directors of Unico. He also served as the president of Unico from 1983 until February 2002. He is presently semi-retired. Mr. Brown served as the chairman of the board of directors of Energy and Corrosion Research Corporation from 1979 to 1982. He also served as president and as a director of Ecotech Corporation from 1971 to 1983. Mr. Brown served as president and as a director of Wasatch Mineral and Construction Company from 1963 to 1971. He served as president and as a director of Courtesy Finance Corporation from 1958 to 1963. Prior to 1958, Mr. Brown served in various capacities with other financial institutions. Mr. Brown attended the University of Utah majoring in banking and finance.

Kiyoshi Kasai served as vice president from 1987 until June 2004 and he has served as a director of Unico since 1987. Mr. Kasai is presently semi-retired. For over 35 years prior to 1987, Mr. Kasai worked as an engineer for various companies including Hughes Helicopter, Litton Systems, Inc., Hoffman Electronics Corporation, RCA Service Company, Convair Astronautics and other companies. Mr. Kasai attended U.C. Berkeley and the Illinois Institute of Technology.

### Significant Employees

Unico has no employees (other than its executive officers) who are expected to make a significant contribution to Unico's business.

Family Relationships

There are no family relationships between any directors or executive officers of Unico, either by blood or by marriage.

Involvement in Certain Legal Proceedings

During the past five years, no present or former director, executive officer or person nominated to become a director or an executive officer of Unico:

(1) was a general partner or executive officer of any business against which any bankruptcy petition was filed, either at the time of the bankruptcy or two years prior to that time;

(2) was convicted in a criminal proceeding or named subject to a pending criminal proceeding (excluding traffic violations and other minor offenses);

(3) was subject to any order, judgment or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining, barring, suspending or otherwise limiting his involvement in any type of business, securities or banking activities; or

(4) was found by a court of competent jurisdiction (in a civil action), the Securities and Exchange Commission or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended or vacated.

23

**Meetings**

During the year ended February 28, 2007 the Board of Directors met on four occasions. Each incumbent Director attended at least 100% of the total number of meetings of the Board of Directors in person or by telephone conference.

**Compensation of Directors**

Unico has no present arrangement for compensating its directors.

**Compliance with Section 16(a) of the Securities Act of 1934**

Section 16(a) of the Securities Exchange Act of 1934 requires Unico's executive officers and directors, and persons who own more than ten percent (10%) of a registered class of Unico's equity securities, to file an initial report of ownership on Form 3 and changes in ownership on Form 4 or 5 with the Securities and Exchange Commission (the "SEC"). Such officers, directors and ten percent (10%) shareholders are also required by the SEC rules to furnish Unico with copies of all Section 16(a) forms they file.

Based solely on its review of the copies of such forms received by it, or written representations from certain reporting persons that no Forms 5 were required for such persons, Unico believes that its executive officers, directors and ten percent (10%) shareholders complied with all Section 16(a) filing requirements applicable to them during the fiscal year ended February 28, 2007, except for the following:

1.  On December 18, 2006, Mr. Wayne Hartle filed a Form 4 report on which he reported three purchases of the Company's common stock by him that occurred November 24, 2006. The report should have been filed within two business days following November 24, 2006.

**ITEM 10.      EXECUTIVE COMPENSATION**

**Summary Compensation Table**

The following table sets forth the annual and long-term compensation for services in all capacities for the fiscal years ended February 28, 2007 and February 28, 2006 paid to the Company's chief executive officer and any other executive officers whose compensation paid by the Company for any of the two fiscal years exceeded $100,000. No other executive officers received compensation exceeding $100,000 during the two fiscal years ended February 28, 2007.

24

**Summary Compensation Table**

| Name and Principal Position | Fiscal Year Ended Feb. 28 | Annual Compensation | | | Long Term Compensation | | |
|---|---|---|---|---|---|---|---|
| | | | | | | Awards | |
| | | Salary | Bonus | Other Annual Compensation | Restricted Stock Award(s) | Securities Underlying Options | All Other Compensation |
| Mark A. Lopez, CEO | 2007 | $150,000(1) | $-0- | $-0- | -- | -- | -- |
| Mark A. Lopez, CEO | 2006 | $150,000(1) | $-0- | $-0- | -- | -- | -- |

(1) The salary for Mark A. Lopez during the fiscal years ended February 28, 2007 and 2006 has been accrued, but it has not yet been fully paid.

**Employment Agreements**

The Company does not currently have any written employment agreements in place.

**Indemnification**

As permitted by the provisions of the General Corporation Law of the State of Arizona, the Company has the power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director, officer, employee or agent of the corporation if such officer or director acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Company. Any such person may be indemnified against expenses, including attorneys' fees, judgments, fines and settlements in defense of any action, suit or proceeding. The Company does not maintain directors and officers liability insurance.

**Stock Option Plan**

Unico has not adopted a stock option plan at this time. Unico may adopt a stock option plan for its executive officers, directors and/or employees in the future.

**Compensation of Directors**

Unico has no present arrangement for compensating its directors.

**ITEM 11.      SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDERS MATTERS**

The following table sets forth information, to the best knowledge of the Company, as of June 11, 2007 with respect to each person known by Unico, Incorporated to own beneficially more than 5% of the outstanding Common Stock, each director and officer, and all directors and officers as a group.

| Number of Shares | Percentage of Class [2] |
|---|---|

| Name and Address | Beneficially Owned [1] | Class | |
|---|---|---|---|
| Mark A. Lopez | 50,000 | Common | * |
| Chief Executive Officer | 5,401,968 | Series A Preferred | 55% |
| Wayne Ash | 2,000 | Common | * |
| President | | | |
| Kenneth Wiedrich | - | Common | * |
| Chief Financial Officer | | | |
| Wayne Hartle | 2,994,224 | Common | * |
| Secretary and Director | 348,989 | Series A Preferred | 4% |
| Ray C. Brown [4] | 16,227,474 | Common | 1% |
| Chairman of the Board of Directors | 3,549,043 | Series A Preferred | 36% |
| Kiyoshi Kasai [3] | 6,930 | Common | * |
| Director | | | |
| All directors and executive officers | 19,280,628 | Common | 1% |
| (6 persons) | 9,300,000 | Series A Preferred | 95% |

(1) Unless indicated otherwise, the address for each of the above listed is c/o Unico, Incorporated at 8880 Rio San Diego Drive, 8 th Floor, San Diego, California 92108.

(2) The above percentages are based on 1,906,735,609 shares of common stock and 9,800,000 shares of Series A Preferred Stock outstanding as of June 11, 2007.

(3) Of the shares listed as being beneficially owned by Kiyoshi Kasai, 400 are owned of record by his wife, Fumiko Kasai, and 1,500 are owned of record by the Kasai Family Trust. Kiyoshi Kasai is the trustee of the Kasai Family Trust, and has sole voting and investment power over the shares held by the Trust.

(4) In addition to the shares listed above as being beneficially owned by Mr. Brown, as of June 11, 2007, Mr. Brown held convertible debentures in the principal amount of $449,513, which are convertible to shares of Unico's common stock. The debentures are convertible at 80% of the bid price of Unico common stock on the date of conversion.

25

### ITEM 12.     CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE

Transactions with Management and Others

Unico has received advances from three related parties; Wayne Hartle, Ray Brown and Mark Lopez. Portions of these advances were converted to convertible debentures that bear interest at 10% per annum and are convertible to common stock of the Company at a discounted rate equal to 80% of the closing bid price on the date of conversion. Ray C. Brown received 10,000,000 of the shares for converting $152,000 of debt, and Mark A. Lopez received 5,000,000 of the shares for converting $76,000 of debt. The remaining balance of $606,918 was restructured as convertible debentures to Ray Brown in the amount of $465,132, Mark Lopez in the amount of $111,144 and Wayne Hartle in the amount of $30,642 all of which can be converted into common stock under the same terms as above. Both the Company and the note holders have the right to convert under these terms. In the event of a company liquidation, the notes automatically convert into common stock at the same rate. During the fiscal year ended February 28, 2007, Mr. Brown converted $100,527 of accrued interest and $74,073 of principal for which he received 7,900,000 shares of Unico Common Stock. During the fiscal year ended February 28, 2007, Mr. Hartle converted $6,859 of accrued interest and $30,642 of principal for which he received 1,953,165shares of Unico Common Stock. As of February 28, 2007, the principal balance of the convertible debentures held by Mr. Brown and Mr. Joseph Lopez, father of Chief Executive Officer Mark Lopez, were $456,593and $114,466, respectively. Mr. Hartle held no debenture as of February 28, 2007.

On March 7, 2005, Ray Brown, Chairman of the Board of Directors, sold 3,000,000 shares of Series A preferred stock back to the Company at $.06 per share. Payment for these shares was structured as a convertible debenture to Ray Brown in the amount of $180,000 which is convertible to shares of Unico common stock at 80% of the closing market price on the date of conversion. The debenture bears interest at 10% per annum. There was a beneficial conversion feature of $45,000 associated with the debenture, which has been recognized as interest expense for the period. Although the $.06 per share was significantly above the market price of the Company's Common Stock, the Company agreed to pay Ray Brown $.06 per share due to Ray Brown's additional agreement to purchase 9,423,784 shares of Series B Preferred Stock at $0.06 per share.

On March 7, 2005, Mark Lopez, Chief Executive Officer of the Company, purchased 3,000,000 shares of Series A preferred stock at the purchase price of $.03 per share for converting $90,000 of debt. Mark Lopez paid significantly more than the current market price of the Company's Common Stock, but was willing to do so in order to acquire majority ownership of the outstanding Series A Preferred shares which will permit him to have control over the election of two of the Company's directors. During the quarter ended May 31, 2005, Mark Lopez was repaid the remaining $30,091 due to him, leaving an accrued interest balance of $283 due to him at the end of the quarter.

26

On March 7, 2005, Unico's Board of Directors authorized the issuance of 9,423,784 shares of its Series B Preferred Stock to Ray Brown at the purchase price of $.06 per share for a total consideration of $565,427. This Series B sale was to eliminate a substantial debt obligation which the Company owed to Ray Brown.

On March 24, 2005, Unico's Board of Directors and Ray Brown mutually rescinded Ray Brown's purchase of 9,423,784 shares of Series B Preferred Stock retroactively to March 7, 2005. This was due to the interpretation of the Securities Exchange Commission ("Commission") that the super voting rights of Unico's Series B Preferred Stock violate Section 18 of the Investment Act of 1940. As a result Ray Brown holds a convertible debenture from the Company in the amount of $645,132 which contains all of the same terms and conditions as the prior convertible debenture held immediately prior to the conversion of that convertible debenture to shares of the Unico's Series B Preferred Stock.

During the fiscal year ended February 28, 2006, Mark Lopez loaned $5,100 to Unico and $50,200 to the Deer Trail Mining Company of which $8,200 was repaid leaving a balance of $42,000. The loans are unsecured, bear interest at 10.0% per annum, and are due upon demand. During the year ended February 28, 2007, the principal and interest were repaid in full.

### ITEM 13.     EXHIBITS

(a)(1)(2) **Financial Statements.** See index to financial statements and supporting schedules.

(a)(3)   **Exhibits.**

The following exhibits are filed as part of this statement:

The exhibits listed below are required by Item 601 of Regulation S-B. Each management contract or compensatory plan or arrangement required to be filed as an exhibit to this Form 10-KSB has been identified.

| **Exhibit No.** | **Description** | **Location** |
|---|---|---|
| 3.1 | Articles of Incorporation | * |
| 3.2 | Amendment to articles of incorporation, dated November 8, 1967 | * |
| 3.3 | Amendment to articles of incorporation, dated December 6, 1972 | * |
| 3.4 | Amendment to articles of incorporation, dated May 29, 1973 | * |
| 3.5 | Amendment to articles of incorporation, dated December 1, 1979 | * |
| 3.6 | Amendment to articles of incorporation, dated May 12, 1992 | * |
| 3.7 | Amendment to articles of incorporation, dated November, 1999 | * |
| 3.10 | Amendment to articles of incorporation, dated June 1, 2004 | ** |
| 3.11 | Amendment to articles of incorporation, dated February 2, 2006 | ****** |
| 3.8 | By-laws | * |
| 3.9 | Board of directors resolution amending Unico's by-laws, dated April 1, 1992 | * |
| 4.1 | Certificate of Designation, Number, Powers, Preferences and Relative, Participating, Optional and other Special Rights and the Qualifications, Limitations, Restrictions and other Distinguishing Characteristics of Series A Preferred Stock | ** |
| 10.38 | Revised Mining Lease and Option to Purchase (Bromide Basin Mining Company, Inc.) dated effective May 1, 2005 | *** |
| 10.39 | Convertible Debenture No. 12 for $ 250,000 dated January 11, 2005 issued to Kentan Limited Corp. | *** |
| 10.40 | Consulting Contract with Javelin Advisory Group, Inc. dated April 1, 2005. | *** |
| 10.41 | Convertible Debenture No. 13 for $125,000 dated March 7, 2005 issued to Kentan Limited Corp. | **** |

| | | |
|---|---|---|
| 10.42 | Convertible Debenture No. 14 for $125,000 dated March 10, 2005 issued to Reef Holdings, Ltd | **** |
| 10.43 | Purchase Contract between PGM, LLC and Deer Trail Mining Company, LLC dated August 31, 2005 | ***** |
| 10.44 | Second Modification of Mining Lease and Option to Purchase (Deer Trail Mine) dated April 21, 2006 | ****** |
| 10.45 | Third Revised Mining Lease and Option to Purchase (Bromide Basin Mines) dated May 1, 2006 | ****** |
| 10.46 | Convertible Debenture No. 15 for $50,000 dated 10/21/05 issued to Kentan Limited Corp. | ****** |
| 10.47 | Convertible Debenture No. 16 for $25,000 dated 11/02/05 issued to Kentan Limited Corp. | ****** |
| 10.48 | Convertible Debenture No. 17 for $25,000 dated 11/23/05 issued to Compass Capital Group, Inc. | ****** |
| 10.49 | Convertible Debenture No. 18 for $7,500 dated 11/30/05 issued to Compass Capital Group, Inc. | ****** |
| 10.50 | Convertible Debenture No. 19 for $25,000 dated 11/30/05 issued to Compass Capital Group, Inc. | ****** |
| 10.51 | Convertible Debenture No. 20 for $50,000 dated 12/01/05 issued to Kentan Limited Corp. | ****** |
| 10.52 | Convertible Debenture No. 21 for $10,000 dated 12/01/05 issued to Kentan Limited Corp. | ****** |
| 10.53 | Convertible Debenture No. 22 for $50,000 dated 12/01/05 issued to Kentan Limited Corp. | ****** |
| 10.54 | Convertible Debenture No. 23 for $25,000 dated 12/15/05 issued to Reef Holdings Ltd. | ****** |
| 10.55 | Convertible Debenture No. 24 for $50,000 dated 12/28/05 issued to Reef Holdings Ltd. | ****** |
| 10.56 | Convertible Debenture No. 25 for $25,000 dated 01/20/06 issued to Reef Holdings Ltd. | ****** |
| 10.57 | Convertible Debenture No. 26 for $25,000 dated 01/27/06 issued to Compass Capital Group, Inc. | ****** |
| 10.58 | Convertible Debenture No. 27 for $50,000 dated 02/14/06 issued to Reef Holdings Ltd. | ****** |
| 10.59 | Convertible Debenture No. 28 for $50,000 dated 02/27/06 issued to Compass Capital Group, Inc. | ****** |
| 10.60 | Convertible Debenture No. 29 for $25,000 dated 03/02/06 issued to Umbrella Holdings | ******* |
| 10.61 | Convertible Debenture No. 30 for $75,000 dated 03/08/06 issued to Umbrella Holdings | ******* |
| 10.62 | Convertible Debenture No. 31 for $75,000 dated 03/15/06 issued to Outboard Investments, LTD | ******* |
| 10.63 | Convertible Debenture No. 32 for $150,000 dated 03/22/06 issued to Outboard Investments, LTD | ******* |
| 10.64 | Convertible Debenture No. 33 for $250,000 dated 0/06/06 issued to Outboard Investments, LTD | ******* |
| 10.65 | Convertible Debenture No. 34 for $250,000 dated 04/18/06 issued to Outboard Investments, LTD | ******* |
| 10.66 | Convertible Debenture No. 35 for $300,000 dated 05/4/06 issued to Outboard Investments, LTD | ******* |
| 10.67 | Convertible Debenture No. 36 for $500,000 dated 05/17/06 issued to Outboard Investments, LTD | ******* |
| 10.68 | Mining Lease with Joel Johnson dated 08/0706 | ******** |
| 10.69 | Convertible Debenture No. 37 for $250,000 dated 06/15/06 issued to Outboard Investments, LTD | ******** |
| 10.70 | Convertible Debenture No. 38 for $100,000 dated 08/15/06 issued to Outboard Investments, LTD | ******** |
| 10.71 | Convertible Debenture No. 39 for $100,000 dated 08/18/06 issued to Outboard Investments, LTD | ******** |
| 10.72 | Convertible Debenture No. 40 for $250,000 dated 08/31/06 issued to Outboard Investments, LTD | ******** |
| 10.73 | Third Modification of Mining Lease and Option to Purchase (Deer Trail Mine) dated 11/01/06 | ********* |
| 10.74 | Fourth Modification of Mining Lease and Option to Purchase (Deer Trail Mine) dated 04/26/07 | ********** |
| 10.75 | Convertible Debenture No. 41 for $200,000 dated 08/2/07 issued to Blue Marble Investments, LTD | ********** |
| 10.76 | Stock Purchase Agreement with Cherry Creek Holdings, LLC dated 12/29/06 | ********** |
| 10.77 | Stock Purchase Agreement with Cherry Creek Holdings, LLC dated 01/12/07 | ********** |
| 14 | Code of Ethics adopted May 19, 2006 | ****** |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | ********** |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | ********** |
| 32.1 | Certification of Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | ********** |
| 32.2 | Certification of Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | ********** |
| 99.1 | Audit Committee Charter adopted July 7, 2004 | *** |

* Incorporated by reference from Unico's Registration Statement on Form 10-SB filed on April 6, 2000.
** Incorporated by reference from Unico's Quarterly Report on Form 10-QSB for the Quarter Ended May 31, 2004 filed on July 22, 2004.
2004 filed on February 24, 2005.
*** Incorporated by reference from Unico's Annual Report on Form 10-KSB for the Fiscal Year Ended February 28, 2005 filed on June 20, 2005.
****Incorporated by reference from Unico's Quarterly Report on Form 10-QSB for the Quarter Ended May 31, 2005 filed July 15, 2005
*****Incorporated by reference from Unico's Quarterly Report on Form 10-QSB for the Quarter Ended November 30, 2005 filed January 26, 2006
****** Incorporated by reference from Unico's Annual Report on Form 10-KSB for the Fiscal Year Ended February 28, 2006 filed on July 18, 2006.
******* Incorporated by reference from Unico's Amended Quarterly Report on Form 10-QSB/A for the Quarter Ended May 31, 2006 filed on October 24, 2006.
******** Incorporated by reference from Unico's Quarterly Report on Form 10-QSB for the Quarter Ended August 31, 2006 filed on October 24, 2006.
********* Incorporated by reference from Unico's Quarterly Report on Form 10-QSB for the Quarter Ended November 30, 2006 filed on January 17, 2007.
**********May be accessed electronically at the Commission's site on the World Wide Web, located at http:www.sec.gov. Upon written request, the Company will provide without charge a copy of the exhibits.

**ITEM 14.**   **PRINCIPAL ACCOUNTANT FEES AND SERVICES**

**Audit Fees**

During the fiscal years ended February 28, 2007 and February 28, 2006, the aggregate fees billed by HJ Associates & Consultants, LLP, for services rendered for the audit of our annual financial statements and the review of the financial statements included in our quarterly reports or services provided in connection with the statutory and regulatory filings or engagements for those fiscal years, was approximately $35,600 and $54,000, respectively.

**Audit Related Fees**

None

**Tax Fees**

None

**All Other Fees**

The aggregate fees billed by the Company's auditors for all other non-audit services rendered to the Company, such as attending meetings and other miscellaneous financial consulting in fiscal 2007 and 2006 were $0 and $0, respectively.

29

**SIGNATURES**

In accordance with Section 13 or 15 (d) of the Exchange Act. The Registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**UNICO, INCORPORATED**

*/s/ Mark A. Lopez*
Mark A. Lopez
Chief Executive Officer

Dated: June 13, 2007

In accordance with the Exchange Act, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| SIGNATURE | | DATE |
|---|---|---|
| /s/ Ray C. Brown | | |
| Ray C. Brown | Director | June 13, 2007 |
| /s/ Kiyoshi Kasai | | |
| Kiyoshi Kasai | Director | June 13, 2007 |
| /s/ Wayne Hartle | | |
| Wayne Hartle | Director | June 13, 2007 |

30

EXHIBIT 31.1

**Unico, Incorporated**
**a Arizona Corporation**
**SECTION 302**
**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**

I, Mark A. Lopez, Chief Executive Officer certify that:

(1)  I have reviewed this annual report on Form 10-KSB of Unico, Incorporated;

(2)  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

(4)  The small business issuer's other certifying officer(s) and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

        (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
        (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
        (c)  Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
        (d)  Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting;

(5)  The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

        (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and
        (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: June 13, 2007

*/s/ Mark A. Lopez*
Mark A. Lopez
Chief Executive Officer

EXHIBIT 31.2

**Unico, Incorporated**
**a Arizona Corporation**
**SECTION 302**
**CERTIFICATION OF CHIEF FINANCIAL OFFICER**

I, Kenneth Wiedrich, certify that:

(1)  I have reviewed this annual report on Form 10-KSB of Unico, Incorporated;

(2)  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

(4)  The small business issuer's other certifying officer(s) and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) small business issuer and have:

   (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c)  Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d)  Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting;

(5)  The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

   (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and
   (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: June 13, 2007

*/s/ Kenneth Wiedrich*
Kenneth Wiedrich
Chief Financial Officer

Exhibit 32.1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to Section 906 of the Corporate Fraud Accountability Act of 2002 (18 U.S.C. Section 1350, as adopted), Mark A. Lopez, Chief Executive Officer of Unico, Incorporated (the "Company"), hereby certifies that, to the best of his knowledge:

1.    the Annual Report on Form 10-KSB of the Company for the fiscal year ended February 28, 2007 (the Report) fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o (d)); and

2.    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: June 13, 2007                              */s/ Mark A. Lopez*
                                                   Mark A. Lopez
                                                   Chief Executive Officer

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

Pursuant to Section 906 of the Corporate Fraud Accountability Act of 2002 (18 U.S.C. Section 1350, as adopted), Kenneth Wiedrich, Chief Financial Officer of Unico, Incorporated (the "Company"), hereby certifies that, to the best of his knowledge:

1.    the Annual Report on Form 10-KSB of the Company for the fiscal year ended February 28, 2007 (the Report) fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o (d)); and

2.    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: June 13, 2007                              */s/ Kenneth Wiedrich*
                                                   Kenneth Wiedrich
                                                   Chief Financial Officer

**UNICO, INCORPORATED**

**February 28, 2007** and **February 28, 2006**

F-1

## CONTENTS

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-3 |
| Consolidated Balance Sheet | F-4 |
| Consolidated Statements of Operations | F-5 |
| Consolidated Statements of Stockholders' Equity (Deficit) | F-6 |
| Consolidated Statements of Cash Flows | F-7 |
| Notes to the Consolidated Financial Statements | F-8 |

F-2

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors
Unico Incorporated
San Diego, California

We have audited the consolidated balance sheet of Unico Incorporated as of February 28, 2007 and the related consolidated statements of operations, stockholders' deficit, and cash flows for the years ended February 28, 2007 and 2006. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Unico Incorporated as of February 28, 2007, and the results of their operations and their cash flows for the years ended February 28, 2007 and 2006, in conformity with United States generally accepted accounting principles.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 7 to the consolidated financial statements, the Company has suffered recurring losses from operations and total liabilities exceed total assets. This raises substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 7. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

HJ Associates & Consultants, LLP
HJ Associates & Consultants, LLP
Salt Lake City, Utah
June 11, 2007

F-3

**UNICO, INCORPORATED**
**Consolidated**
**Balance Sheet**
**ASSETS**

|  | February 28, 2007 |
|---|---|
| **Current Assets** | |
| Cash | $ 7,194 |
| Total Current Assets | 7,194 |
| **Fixed Assets** | |
| Equipment, furniture, etc. net of depreciation (Note 1) | 583,228 |
| Construction in progress | 1,726,861 |
| Total Fixed Assets | 2,310,089 |
| **Other Assets:** | |
| Cash- reclamation bonds | 207,703 |
| Deposit | 20,460 |
| Total Other Assets | 228,163 |
| Total Assets | $ 2,545,446 |

**LIABILITIES AND STOCKHOLDERS' DEFICIT**

|  |  |
|---|---|
| **Current Liabilities** | |
| Accounts payable | $ 246,607 |
| Accrued expenses | 31,607 |
| Reclamation obligations | 131,784 |
| Accrued interest payable | 120,100 |
| Accrued interest payable - related party (Note 2) | 33,707 |
| Derivative liability | 3,019,291 |
| Debentures payable, net of discount (Note 3) | 1,148,000 |
| Debentures payable-related party (Note 2) | 571,059 |
| Total Current Liabilities | 5,302,155 |
| Total Liabilities | 5,302,155 |
| **Stockholders' Deficit** | |
| Preferred Stock, authorized 20,000,000 shares, $0.001 Par Value, 9,800,000 shares issued and outstanding | 9,800 |
| Common Stock, authorized 5,000,000,000 shares, $0.001 Par Value, 1,005,419,819 shares issued and outstanding | 1,005,420 |
| Stock payable | 999,000 |
| Additional paid in capital | 40,113,832 |
| Accumulated deficit | (44,884,761) |
| Total Stockholders' Deficit | (2,756,709) |
| Total Liabilities and Stockholders' Deficit | $ 2,545,446 |

The accompanying notes are an integral part of these consolidated financial statements.

F-4

UNICO, INCORPORATED
Consolidated
Statements of Operations

| | For the Year Ended February 28, | |
| --- | --- | --- |
| | 2007 | 2006 |
| Total Revenues | $ - | $ 26,202 |
| Operating Expenses | | |
| Drilling, exploration and maintenance expense | 403,855 | 168,426 |
| Depreciation and accretion | 225,216 | 123,102 |
| Salaries/Wages | 327,936 | 367,667 |
| General and Administrative expense | 840,107 | 797,179 |
| Total Operating Expenses | 1,797,114 | 1,456,374 |
| Net Operating Loss | (1,797,114) | (1,430,172) |
| Other Income (Expense) | | |
| Interest expense | (2,853,375) | (948,988) |
| Interest income | 6,112 | 4,936 |
| Derivative gain (loss) on debentures | (434,060) | 165,792 |
| Other income | - | 886 |
| Loss on sale of assets | (5,914) | - |
| Loss on settlement of debt | (13,248,915) | (64,551) |
| Total Other Expense | (16,536,152) | (841,925) |
| LOSS FROM CONTINUING OPERATIONS | (18,333,266) | (2,272,097) |
| Income Tax Expense | - | - |
| Net Loss | $ (18,333,266) | $ (2,272,097) |
| Net Loss Per Share | $ (0.071) | $ (0.005) |
| Weighted Average Shares Outstanding | 257,245,898 | 504,619,303 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

UNICO, INCORPORATED
Statements of Stockholders' Equity (Deficit)

| | Preferred Stock Shares | Amount | Common Stock Shares | Amount | Additional Paid-in Capital | Stock Payable | Retained Earnings (Deficit) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Balance, February 28, 2005 | 9,800,000 | $ 9,800 | 4,984,279 | $ 4,984 | $ 20,219,391 | $ - | $ (24,279,398) |
| Purchase of preferred stock from related party | (3,000,000) | (3,000) | - | - | (177,000) | - | - |
| Preferred stock issued for related party debt extinguishments | 3,000,000 | 3,000 | - | - | 87,000 | - | - |
| Stock issued for conversion of debentures | - | - | 1,738,357 | 1,739 | 322,112 | - | - |
| Derivative portion of convertible debentures | - | - | - | - | 677,261 | - | - |
| Net Loss for year ended February 28, 2006 | - | - | - | - | - | - | (2,272,097) |
| Balance, February 28, 2006 | 9,800,000 | 9,800 | 6,722,636 | 6,723 | 21,128,764 | - | (26,551,495) |
| S8 Stock issued for services | - | - | 2,100,000 | 2,100 | 28,400 | - | - |
| Derivative portion of convertible debentures | - | - | - | - | 16,095,712 | - | - |
| Stock issued for conversion of debentures | - | - | 9,853,165 | 9,853 | 202,248 | - | - |
| Stock issued under court ordered settlement | - | - | 986,744,018 | 986,744 | 1,844,880 | - | - |
| Write-off of interest on previously converted debentures | - | - | - | - | 63,829 | - | - |
| Price adjustment for stock issued under court ordered settlement | - | - | - | - | 750,000 | - | - |
| Sale of stock to be issued | - | - | - | - | - | 999,000 | - |
| Net Loss for year ended February 28, 2007 | - | - | - | - | - | - | (18,333,266) |
| Balance, February 28, 2007 | 9,800,000 | $ 9,800 | 1,005,419,819 | $ 1,005,420 | $ 40,113,833 | $ 999,000 | $ (44,884,761) |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

**UNICO, INCORPORATED**
**Consolidated Statements of Cash Flows**

| | | For the Year Ending February 28, | |
|---|---|---|---|
| | | **2007** | **2006** |
| Cash Flows from Operating Activities: | | | |
| Net Loss | $ | (18,333,266) | $ (2,272,097) |
| Adjustments to Reconcile Net Loss to Net Cash Provided by Operations: | | | |
| Depreciation and accretion expense | | 225,216 | 123,102 |
| Loss on sale of assets | | 5,914 | - |
| Loss on settlement of debt | | 13,248,915 | 64,551 |
| Derivative (gain) loss | | 434,060 | (165,792) |
| Derivative/Interest related to convertible debentures | | 2,641,747 | - |
| Common Stock issued for services | | 30,500 | 747,083 |
| Changes in Operating Assets and Liabilities: | | | |
| (Increase) Decrease in: | | | |
| Reclamation deposit | | (28,588) | 12,962 |
| Prepaid expense | | (14,800) | 3,664 |
| Increase (Decrease) in: | | | |
| Accrued expenses | | (529,910) | - |
| Accounts Payable and other liabilities | | (203,160) | 841,303 |
| Net Cash Used by Operating   Activities | | (2,523,372) | (645,224) |
| Cash Flows from Investing Activities: | | | |
| Purchases of fixed assets- construction in progress | | (1,726,861) | - |
| Purchases of fixed asset | | (72,281) | - |
| Sale of fixed assets | | 26,200 | (20,000) |
| Net Cash Used by Investing  Activities | | (1,772,942) | (20,000) |
| Cash Flows from Financing Activities: | | | |
| Decrease in bank overdraft | | - | (2,826) |
| Proceeds from stock payable | | 999,000 | - |
| Payments on notes and debentures | | - | (21,144) |
| Capital contribution from shareholders | | 750,000 | - |
| Proceeds of convertible debentures | | - | 717,500 |
| Issuance of convertible debentures | | 2,525,000 | - |
| Net Cash Provided by Financing Activities | | 4,274,000 | 693,530 |
| Net Increase (Decrease) in Cash | | (22,314) | 28,306 |
| Cash at Beginning of Period | | 29,508 | 1,202 |
| Cash at End of Period | $ | 7,194 | $ 29,508 |
| Cash Paid For: | | | |
| Interest | $ | 25,000 | $ - |
| Income Taxes | $ | - | $ - |
| Non-Cash Financing Activities: | | | |
| Common stock issued for services | $ | 30,500 | $ - |
| Common stock issued for debt under court ordered settlement | $ | 2,831,624 | $ 105,000 |
| Common Stock issued for debt extinguishments | $ | 212,101 | $ - |
| Preferred Stock issued for debt extinguishments | $ | - | $ 90,000 |

The accompanying notes are an integral part of these consolidated financial statements.

F-7

UNICO, INCORPORATED
Notes to the Consolidated Financial Statements
February 28, 2007 and February 28, 2006

**NOTE 1 – NATURE OF ORGANIZATION AND SIGNIFICANT ACCOUNTING PRINCIPLES**

This summary of significant accounting policies of Unico, Incorporated is presented to assist in understanding the Company's consolidated financial statements. The consolidated financial statements and notes are representations of the Company's management who are responsible for their integrity and objectivity. These accounting policies conform to accounting principles generally accepted in the United States of America and have been consistently applied in the preparation of the consolidated financial statements.

a.    Organization and Business Activities

Unico, Incorporated was formed as an Arizona corporation on May 27, 1966 under the name of Red Rock Mining Co., Incorporated. It was later known as Industries International, Incorporated and I.I. Incorporated before the name was eventually changed to Unico, Incorporated in 1979.

On July 12, 2004, Unico filed an election with the U.S. Securities and Exchange Commission to become a business development company pursuant to Section 54 of the Investment Company Act of 1940. Unico's Deer Trail Mine operations are conducted through Deer Trail Mining Company, LLC, a Nevada limited liability company while Unico's Bromide Basin Mine operations are conducted through Bromide Basin Mining Company, LLC, a Nevada limited liability company. Unico also owns Silver Bell Mining Company, Inc., which is not presently operational. On October 11, 2005, the Unico shareholders approved a proposal to authorize the Company's Board of Directors to withdraw the Company's election to be treated as a BDC. On October 12, 2005 a Notification of Withdrawal of BDC Election was filed with the Securities and Exchange Commission so that Unico could begin conducting business as an operating company rather than as a BDC subject to the Investment Company Act.

The Company presently has three wholly-owned subsidiaries: Deer Trail Mining Company, LLC, Silver Bell Mining Company, Inc., and Bromide Basin Mining Company, LLC. While the Company reported under the Investment Company Act as a Business Development Company, the operations of these entities were not consolidated but, rather, were treated as investments and were carried on the Company's books at their fair market value. As a result of the Company's withdrawal as a BDC, the equity method of accounting is now applicable. As a result, the accompanying consolidated financial statements are those of the Company and its wholly owned subsidiaries, Deer Trail Mining Company, LLC, Silver Bell Mining Company, Inc. and Bromide Basin Mining Company, LLC.

b.    Accounting Method

The Company's consolidated financial statements are prepared using the accrual method of accounting. The Company has elected a February 28 $^{th}$ year-end. With the Company's withdrawal as a BDC, the Company now reports the operations of itself and its subsidiaries under the equity method of accounting, resulting in the consolidation of all assets and operations of wholly-owned subsidiaries.

c.    Cash and Cash Equivalents

For the purpose of the statement of cash flows, the Company considers all highly liquid investments purchased with a maturity of three months or less to be cash equivalents. As of February 28, 2007 the company had $7,194 in cash and $213,163 in CD's deposited in banks.

d.    Estimates

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from the estimates.

F-8

e.    Fixed Assets

The Company's property consists of mining equipment, vehicles, office furniture and computer equipment. The property is depreciated in a straight-line basis over five years. Fixed assets are recorded at cost. Major additions and improvement are capitalized. The cost and related accumulated depreciation of equipment retired or sold are removed from the accounts and any differences between the undepreciated amount and the proceeds from the sale are recorded as gain or loss on sale of assets.

Fixed Asset Schedule

|  | | 2007 |
|---|---|---|
| Fixed Assets: | | |
| Furniture & Equipment | $ | 1,064,758 |
| Land | | 200,000 |
| Autos | | 65,814 |
| Total | | 1,330,572 |
| Less Depreciation | | (747,344) |
| Net Equipment | $ | 583,228 |

f. Basic Loss Per Share
The computation of basic loss per share of common stock is based on the weighted average number of shares outstanding during the period of the financial statements. Fully diluted loss per share is not presented as any common stock equivalents are antidilutive in nature. Common stock equivalents consisting of convertible debt and preferred stock have not been included in the calculation of loss per share.

|  | 2007 | 2006 |
|---|---|---|
| Loss from operations | $ (18,333,266) | $ (2272097) |
| Total loss per share | $ (.071) | $ (0.005) |
| Weighted Average Number of Shares Outstanding | 257,245,898 | 504,619,303 |

g. Income Taxes

Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards and deferred tax assets are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment. Net deferred tax assets consist of the following components as of February 28, 2007 and February 28, 2006:

|  | 2007 | 2006 |
|---|---|---|
| Deferred tax assets: |  |  |
| NOL Carryover | $ 3,576,630 | $ 2,758,700 |
| Accrued Expenses | 25,500 | 226,000 |
| Deferred tax liability: |  |  |
| Accumulated Depreciation | (92,400) | (136,000) |
| Valuation allowance | (3,508,730) | (2,848,700) |
| Net deferred tax asset | $ - | $ - |

The income tax provision differs from the amount of income tax determined by applying the U.S. federal income tax rates of 39% to pretax income from continuing operations for the years ended February 28, 2007 and February 28, 2006 due to the following:

|  | 2007 | 2006 |
|---|---|---|
| Book income | $ (7,149,975) | $ (691,573) |
| Depreciation | 68,835 | 12,845 |
| Forgiveness of Debt | - | (44,378) |
| Accrued Expense | (200,665) | 180,610 |
| Stock for services | 11,895 | 182,325 |
| Debentures | 5,167,075 | - |
| Derivative Loss | 169,280 | - |
| Other | 250 | - |
| Sale of Assets | 7,710 | - |
| Interest | 1,108,665 | - |
| Valuation allowance | 816,930 | 360,171 |
|  | $ - | $ - |

F-9

At February 28, 2007, the Company had net operating loss carryforwards of approximately $9,100,000 that may be offset against future taxable income from the year 2007 through 2027. No tax benefit has been reported in the February 28, 2007 consolidated financial statements since the potential tax benefit is offset by a valuation allowance of the same amount.

Due to the change in ownership provisions of the Tax Reform Act of 1986, net operating loss carryforwards for Federal income tax reporting purposes are subject to annual limitations. Should a change in ownership occur, net operating loss carryforwards may be limited as to use in future years.

h.    Recent Accounting Pronouncements

During the year ended February 28, 2007, the Company adopted the following accounting pronouncements:

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements* , ("SFAS 157"). SFAS 157 defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles and expands disclosures about fair value measurements. SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007 and interim periods within those fiscal years. The Company does not anticipate adoption of this standard will have a material impact on its consolidated financial statements.

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes-an interpretation of SFAS 109" , ("FIN 48"). FIN 48 provides interpretive guidance for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 is effective for fiscal years beginning after December 15, 2006. The Company does not anticipate adoption of this standard will have a material impact on its consolidated financial statements.

In March 2006, the FASB issued SFAS No. 156, "Accounting for Servicing of Financial Assets", which will be effective for fiscal years that begin after December 15, 2006. This statement amends SFAS 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, a replacement of FASB Statement 125,* or SFAS 140 , regarding (1) the circumstances under which a servicing asset or servicing liability must be recognized, (2) the initial and subsequent measurement of recognized servicing assets and liabilities, and (3) information required to be disclosed relating to servicing assets and liabilities. The Company does not anticipate adoption of this standard will have a material impact on its consolidated financial statements.

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments" , or SFAS 155, which will be effective for fiscal years that begin after December 15, 2006. This statement amends SFAS 133, *Accounting for Derivative Instruments and Hedging Activities* , to narrow the scope exception for interest-only and principal-only strips on debt instruments to include only such strips representing rights to receive a

specified portion of the contractual interest or principal cash flows. SFAS 155 also amends SFAS 140 to allow qualifying special-purpose entities to hold a passive derivative financial instrument pertaining to beneficial interests that itself is a derivative financial instrument. The Company does not anticipate adoption of this standard will have a material impact on its consolidated financial statements.

In May 2005, the FASB issued SFAS No. 154, "Accounting Changes and Error Corrections ", which was adopted effective January 1, 2006. This statement addresses the retrospective application of such changes and corrections and will be followed if and when necessary. Adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In December 2004, the FASB issued Statement No. 123 (revised 2004), "Share-Based Payment" ("SFAS 123 (R)"), which requires the recognition of share based payments cost in earnings. This Statement replaces Statement No. 123, "Accounting for Stock-Based Compensation" ("SFAS No. 123") and supersedes Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB No. 25"), which permitted the recognition of compensation expense using the intrinsic value method. Effective January 1, 2006, the Company adopted the provisions of SFAS No. 123(R).  Adoption of this standard did not have a material impact on the Company's consolidated financial statements.

i.       Revenue Recognition

The Company will recognize revenues from sales of minerals. Minerals will be milled at the Deer Trail site from ore that is mined or taken from existing stockpiles of previously mined ore and sent to outside firms for the extraction of the minerals. Revenue from all sources will be recognized when persuasive evidence of an arrangement exists and the amount is fixed or determinable, delivery has occurred, and collection is reasonably assured. Any amounts received in advance of the minerals being delivered will be recorded as deferred revenue.

j.       Preferred Stock

There are 9,800,000 outstanding shares of preferred stock. The Board of Directors has designated ten million (10,000,000) shares of Series A preferred with the following rights and preferences: The Series A Preferred shall, at the option of the holder, be convertible on a one for one share basis to common stock of the Company. The holders of shares of Series A Preferred are not entitled to vote such shares. In lieu of voting rights the holders of Series A Preferred, voting together as a class, are entitled to elect two members of the Board of Directors at each meeting. Also the Series A Preferred is not affected by any capital reorganization of the Company.

k.       Accounting for Derivatives

Convertible debentures, the Company's sole derivative instruments, are accounted for under EITF 00-27 unless liability classification of the derivative is more appropriate.  Where the embedded conversion option appears to qualify for liability classification, derivatives are accounted for under EITF 00-19.

Under EITF 00-27, the Company records a beneficial conversion cost associated with the convertibility feature of the security that equals the value of any discount to market available at the time of conversion.  This beneficial conversion cost is recorded at the time the convertible security is first issued.  If the debenture is subsequently converted into stock, the liability is reduced and common stock is increased.

EITF 00-19 is applicable to debentures issued by the Company in instances where the number of shares into which a debenture can be converted is not fixed.  For example, when a debentures converts at a discount to market based on the stock price on the date of conversion.  In such instances, EITF 00-19 requires that the embedded conversion option of the convertible debentures be bifurcated from the host contract and recorded at their fair value.  In accounting for derivatives under EITF 00-19, the Company records a liability representing the estimated present value of the conversion feature considering the historic volatility of the Company's stock, and a discount representing the imputed interest associated with the beneficial conversion feature.  The discount is then amortized over the life of the debentures and the derivative liability is adjusted periodically according to stock price fluctuations.  At the time of conversion, any remaining derivative liability is charged to additional paid-in capital. For purposes of determining derivative liability, the Company uses Black-Schoels modeling for computing historic volatility.

**NOTE 2 – RELATED PARTY DEBENTURES**

The Company previously issued convertible debentures of $645,132 to Ray Brown, a member of the board of directors, and $30,642 to Wayne Hartle, corporate secretary. These debentures bear interest at 10% per annum and were due September 2005, and December 25, 2004, respectively. The debentures are convertible into common stock of the Company at a discount of 20% off the closing bid price of the common stock on the date of conversion. The Company has recorded an accrued interest payable of $32,343 for the related party convertible debentures as of February 28, 2007 and a gain of $171,112 on the derivative portion of the debentures which resulted from the recapture of derivative expense recorded in prior years. During the year ended February 28, 2007, the Company converted a total of $212,101 in principal and interest through the issuance of 9,853,165 shares of restricted common stock, leaving a balance due as of February 28, 2007 to Mr. Brown of $456,593. In addition Ray Brown assigned  $114,466 of his outstanding convertible debenture to Joseph Lopez, father of the Company's Chief Executive Officer, Mark Lopez, as satisfaction on a personal loan.

**NOTE 3 – CONVERTIBLE DEBENTURES**

During the fiscal year ended February 28, 2007, the Company issued $2,525,000 of convertible debentures that were used primarily to support subsidiary operations.  The debentures were issued with terms of 180 days, accrued interest at 8% per annum, and converted at a discount of 50% of the closing bid for the Company's common stock on the date of conversion.  The Company recorded interest expense of $2,842,735 during the year ended February 28, 2007 associated with the debentures and recorded a loss of $605,172 on the derivative portion of the debentures. The net derivative liability at February 28, 2007 was $3,019,291.  As of February 28, 2007, the Company had $1,315,000 in non-affiliate convertible debentures issued and outstanding less discounts of $167,000.

During the year ended February 28, 2007, the Company entered into a total of 108 settlement transactions in the Twelfth Circuit (State) Court in Florida stemming from defaulted convertible debentures totaling $2,740,000. Unico agreed to settle each action by issuing a total of 986,744,018 shares of its common stock to the note holders. These shares were issued pursuant to Section 3(a)(10) of the Securities Act of 1933, as amended, after a hearing with notice to, and an opportunity to be heard from, interested parties, as to the fairness of each transaction, by a state court in Florida which specifically determined, prior to declaring that the transactions were exempt under Section 3 (a)(10), that the transactions were fair to the interested parties. As a result of issuing shares under the settlements, the Company recorded an expense of $13,248,915 and recognized $63,829 in income from interest forgiven as part of the settlement. In addition, $750,000 was paid to the Company from the debenture holders resulting from an adjustment in the stock price subsequent to the court ordered settlement. This price adjustment was treated as an adjustment to additional paid-in capital.

F-11

## NOTE 4 –STOCKHOLDER'S EQUITY

*Common Stock*

As of February 28, 2007, the Company had 1,005,419,819 shares of common stock issued and outstanding with 3,994,580,181 shares authorized but unissued.

During the year ended February 28, 2007 the Company issued 986,744,018 shares of free trading common stock under court ordered settlement agreements as satisfaction of convertible debentures totaling $2,740,000 which were in default. These shares were issued pursuant to Section 3(a)(10) of the Securities Act of 1933, as amended, after a hearing with notice to, and an opportunity to be heard form, interested parties, as to the fairness of each transaction, by a state court in Florida who specifically determined, prior to declaring that the transactions were exempt under Section 3(a)(10), that the transactions were fair to the interested parties. As a result of this settlement, the Company recorded an expense of $13,248,915 which represented the difference in market value of the stock issued compared with the value of the stock which would have been issuable under the conversion terms.

During the year ended February 28, 2007, the Company issued a total of 2,100,000 shares of common stock to third party consultants under an S-8 registration statement in exchange for services valued at $30,500.

During the year ended February 28, 2007, the Company issued a total of 9,853,165 shares of stock on the conversion of debentures payable plus interest to Ray Brown and Wayne Hartle totaling $212,101.

*Stock Options*

During the year ended February 28, 2007, all stock options expired unexercised. As of February 28, 2007, there were no stock options outstanding.

*Preferred Stock*

As of February 28, 2007, the Company had 9,800,000 shares of preferred stock issued and outstanding, all of which is Series A preferred stock. The Series A Preferred Stock entitle the holder to elect two of the Company's directors and is convertible into shares of common stock on a 1:1 basis.

*Stock Payable*

During the year ended February 28, 2007, the Company sold a total of 76,119,033 shares of restricted common stock to a third party for total consideration of $999,000. As of February 28, 2007, these shares had not been issued, resulting in a stock payable.

## NOTE 5 – LEGAL MATTERS

Kaibab Industries, Inc., the lessor of the Bromide Basin Mine property, demanded that Unico pay the entire balance due on a promissory note dated April 1, 2003 which was secured with certain equipment owned by Unico. Kaibab Industries, Inc. also demanded that Bromide Basin Mining Company, LLC pay $30,000 for unpaid rent which it alleged was owed under the Second Revised Mining Lease and Option to Purchase (the "Lease") plus all taxes and mining claim renewal fees to be reimbursed pursuant to the Lease. The Lease expired on October 31, 2005. Kaibab Industries, Inc. threatened to file suit to collect the amounts it alleged were owing. On or about May 1, 2006, Unico paid all $125,785 owed under the promissory note, and $63,591 for past rent, taxes and mining claim renewal fees owed under the Lease. Also effective May 1, 2006, Unico and Kaibab Industries, Inc. entered into a Third Revised Mining Lease and Option to Purchase.

During the year ended February 28, 2007, the Company entered into a total of 108 settlement transactions in the Twelfth Circuit (State) Court in Florida stemming from defaulted convertible debentures totaling $2,740,000. Unico agreed to settle all of the action by issuing a total of 986,744,018 shares of its common stock to the plaintiffs These shares were issued pursuant to Section 3(a)(10) of the Securities Act of 1933, as amended, after a hearing with notice to, and an opportunity to be heard from, interested parties, as to the fairness of each transaction, by a state court in Florida which specifically determined, prior to declaring that the transactions were exempt under Section 3 (a)(10), that the transactions were fair to the interested parties.

F-12

## NOTE 6 – SUBSEQUENT EVENTS

Subsequent to the fiscal year ending February 28, 2007, the Company received $2,840,000 through the issuance of new convertible debentures. The new debentures were issued with terms of 180 days , bear interest at the rate of 8% per annum, and are convertible by the holder into shares of the Company's common stock at a discount of 50% of the closing bid price on the date of conversion.

Subsequent to February 28, 2007, the Company agreed to settle a total of $550,000 in defaulted convertible debentures under court ordered settlement, which resulted in the issuance of 901,315,790 shares of the Company's common stock. The shares were issued under an exemption from registration provided by Section 3a(10) of the Securities Act of 1933.

## NOTE 7 – GOING CONCERN

The Company's financial statements are prepared using accounting principles generally accepted in the United States of America applicable to a going concern, which contemplates the realization of assets and liquidation of liabilities in the normal course of business. The Company has incurred losses of $44,884,761 from its inception through February 28, 2007. It has not established any revenues with which to cover its operating costs and to allow it to continue as a going concern.

During the next 12 months, the Company's plan of operation is to raise approximately $5,000,000 for investment

into its subsidiary companies: Deer Trail Mining Company, Bromide Basin Mining Company and Silver Bell Mining Company. The funds are intended for the following purposes:

- Complete logging and shipment of core samples identified and taken from the completed 2nd phase of exploratory drilling at the Deer Trail Mine and have them analyzed/certified by an independent lab and consulting firm;
- Continue sampling and analyzing ore from the Deer Trail Mine to evaluate the most efficient means to conduct future mining and milling activities;
- Increase mining activities and upgrade mine infrastructure at the Deer Trail Mine;
- Continue to upgrade and complete the re-construction project on the existing mill at the Deer Trail Mine;
- Upgrade the crushing facility at the upper Deer Trail Mine and continue processing the ore dumps;
- Begin milling and processing activities at the Deer Trail Mine mill facility;
- Acquire new mining equipment to improve operations at the Deer Trail Mine;
- Upgrade and complete modifications to the electrical substation at the Deer Trail Mine;
- Conduct an extensive preproduction feasibility study at the Bromide Basin Mine prior to any additional mining production and analyze the potential of the claims before exercising its purchase option from Kaibab Industries;
- Exercise the purchase option on the Bromide Basin Mine lease;
- Conduct additional survey and mapping work on the Clyde and Crown Point mining claims including improvements to the property and potentially underground and surface exploratory drilling on the claims;
- Commence an exploration and resource definition program at the Silver Bell Mine beginning in 2007; and
- Exercise or extend an option to purchase the Deer Trail Mine for $3,000,000.

Accomplishing the 12-month plan of operations is dependent on the Company raising approximately $5,000,000 in equity and/or debt financing during the next 12 months. Subsequent to the fiscal year ending February 28, 2007, the Company received $2,840,000 through the issuance of new convertible debentures. The new debentures were issued with terms of 180 days, bear interest at the rate of 8% per annum, and are convertible by the holder into shares of the Company's common stock at a discount of 50% of the closing bid price on the date of conversion. The Company intends to raise approximately an additional $2,000,000 to $3,000,000 during the fiscal year ending February 28, 2007 to fulfill the 12-month plan.

F-13